**STATE of Missouri, Respondent,**

v.

**James R. JOHNSON, Appellant.**

No. 75878.

Supreme Court of Missouri,
En Banc.

April 30, 1998.

Rehearing Denied May 26, 1998.

Janet M. Thompson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David G. Brown, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, Judge.

Appellant, James R. Johnson, was convicted by a Laclede County jury of four counts of first degree murder and was sentenced to death on all four convictions. His motion for postconviction relief under Rule 29.15 was overruled. Because the death penalty was imposed, his appeal lies exclusively with this Court. Mo. Const. art. V, sec. 3. The judgments are affirmed.

## I. FACTS

Johnson does not dispute the sufficiency of the evidence. That evidence, which we review in the light most favorable to the verdict, *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995), reveals the following:

Johnson lived in rural Moniteau County with his wife, Jerri Wilson, and her 19 year old daughter, Dawn Becker. Johnson and Becker had an uneasy relationship and fought a great deal. On the evening of December 8, 1991, the two of them were involved in an argument during which Johnson cried out that "he couldn't take it anymore" and told his wife that her daughter had to move out. His wife replied that if her daughter moved out, so would she. Johnson then told her to choose between her daughter and him, and when his wife chose her daugh-

ter, Johnson ordered them both out of the house. At that point, they refused to be forced out, so Johnson produced a loaded rifle and pointed it at his wife. When she did not back down, Johnson pointed the rifle at Becker. Johnson then grabbed Becker in a choke hold and forced her out of the door at which time she fled.

Within a few minutes, Johnson loaded some guns and ammunition into his car and drove away. He returned later with Becker in his car and told his wife that he wanted to work things out. Shortly thereafter, Deputy Les Roark of the Moniteau County Sheriff's Department arrived at the house to investigate a domestic disturbance. Roark asked to speak with Becker, but Johnson refused. His wife brought Becker to the door and told Roark that they were both fine. As Roark was walking back to his car, Johnson pulled out a .38 caliber pistol, stepped onto the porch, and shot Roark twice, once in the rear, and once in the back of the hand. Johnson then stepped back inside, but when he heard Roark moaning, he went again to the porch and shot Roark in the forehead, killing him.

Johnson soon left the house in the car with his guns and ammunition, and with clothes and a thermos, and drove to the home of Sheriff Kenny Jones, whose family was having a Christmas party. Using a .22 caliber semi-automatic rifle, Johnson opened fire on a group of people he saw through the bay window. Pam Jones, the wife of the sheriff, was shot five times, once in the shoulder, once in the face, once in the neck, and twice in the back of the head. She died in her home in front of her family.

Johnson next appeared outside the home of Moniteau County Deputy Sheriff Russell Borts. Johnson shot Borts through a window while Borts was talking on the telephone. Although Borts was shot four times, once in the hand, twice in the chest, and once in the face, he survived, but he was still under medical care at the time of the trial.

After shooting Borts, Johnson went to the sheriff's office where peace officers from numerous jurisdictions had gathered. When word of the attack on Borts arrived, the officers rushed out from the sheriff's office.

Johnson, who was lying in wait, fired on the emerging officers. Cooper County Sheriff Charles Smith was shot four times with a .22 caliber semi-automatic rifle, once in the face, once in the right side, once in the upper back, and once in the head. He died from the shot to the head.

Moments later, Miller County Deputy Sandra Wilson arrived at the sheriff's office, stopped her patrol car in the street, and slid to the passenger side. As she started to climb from the car onto the pavement, Johnson shot her through the heart with an 8-millimeter, bolt-action Mauser. Deputy Wilson died on the pavement.

Johnson then fled to the back porch of the home of an elderly woman named Dorthy-Mae Miller and hid there for the rest of the night. The next morning, he confronted Mrs. Miller and hid in her house for most of the day, holding her hostage. During that time, Johnson admitted to Mrs. Miller that he had shot five people. That evening, Johnson allowed Mrs. Miller to leave the house so that she could attend a Christmas party where she was expected. Upon her release, Mrs. Miller notified authorities that Johnson was in her house. Soon thereafter, law enforcement officers surrounded her house and negotiated Johnson's surrender.

At trial, Johnson admitted the killings and defended on a plea of not guilty by reason of mental disease or defect under Chapter 552, RSMo. In presenting this defense, Johnson, a Vietnam veteran, claimed to be a victim of Post Traumatic Stress Disorder (PTSD), that rendered him incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct. *See* sec. 552.030.

## II. VOIR DIRE

Johnson contends that several comments made by the State to the venire panel were so prejudicial that they amounted to prosecutorial misconduct, that his counsel was ineffective for failing to object to the State's comments, and that the trial court plainly erred by not declaring a mistrial *sua sponte*. These comments, Johnson explains, violated his rights to due process and freedom from cruel and unusual punishment. The com-

ments include the following: 1) that the penalty phase would be a "gut check," 2) that the jurors should ignore any other information they had, 3) whether the jurors in the "proper case" could "legitimately consider" the death penalty, 4) that the jurors should repress or sublimate anything they recalled in the midst of trial, 5) whether the jurors could impose death in a case of homicides of law enforcement personnel, 6) that aggravators are "a little point" or "a little diversion," and 7) that Russell Borts was "lucky to be with us." Additionally, Johnson complains that the comments were too "factually specific."

■ As noted, no objections were made to these comments, so Johnson requests that this Court review for plain error. Plain error relief will only be granted if manifest injustice or miscarriage of justice resulted from the error. *Rule 30.20* ; *State v. Simmons*, 955 S.W.2d 729, 736 (Mo. banc 1997). Johnson does not favor this Court with an explanation of how these comments resulted in manifest injustice or miscarriage of justice, and his failure to do so is not surprising. When viewed in context and not grossly mischaracterized as defendant has done, the comments were not improper, and no error was committed. Undoubtedly, that is why trial counsel made no objections. An extended opinion on the matter would have no precedential value. *Rule 84.16(b)*. The complaints regarding voir dire are denied.

---

1. The text of defense counsel's outline of this part of the evidence follows:

On the morning of December 10 th, Jim Johnson woke up from one of those horrible nightmares that you've all had. And it was so lifelike, and he'd been back in Vietnam, only there was something wrong with the dream. . . .

. . . It was what doctors call an acute dissociative reaction, and he was reliving war trauma and he couldn't control what he was doing.

And everything was so much like Vietnam, he was back in Vietnam. And all of a sudden, there was a dink. . . . He was invading his perimeter, and he had to protect it and he shot him. . . . And just like in Vietnam, he went out and finished him off . . . . because that's what you do in Vietnam. . . .

. . . .

And he had to try to find the leader, and he went looking for the leader. . . . He saw the leader and he killed the leader just like they taught him in the army. . . .

## III. GUILT PHASE

### A. The Perimeter Evidence

■ The primary thrust of Johnson's entire appeal is a combined claim of prosecutorial misconduct and ineffective assistance of counsel arising from defense counsel's mistaken use of certain evidence to support the PTSD defense. That evidence, which defense counsel highlighted in opening statement, consisted of 1) a tin-can-rope perimeter set up around Johnson's garage, 2) a foil wrapper, possibly from a baked potato, found in the garage, and 3) the flattened tires on Johnson's vehicle. Defense counsel's theory, as related to the jury, was that on the night in question, Johnson experienced Vietnam-related flashbacks—an "acute disassociative reaction"—that led him to believe that he was back in Vietnam, confronted by the enemy, and "fighting in a free-fire zone." In an effort to maintain a defensive position, he had supposedly set up the perimeter so that persons coming near the garage would hit the rope and cause the tin cans to rattle, and while resting within the perimeter, he renourished himself with a baked potato. He flattened the tires, according to the story, to disable his vehicle and prevent the enemy from using it against him. Defense counsel then related in some detail how Johnson left his perimeter on a "reconnaissance" mission, encountered the enemy (the three remaining murder victims) and dispatched them.[1]

And now, just like he was in the army, now you find safety. And he doesn't remember particularly finding safety, but somewhere during the night, somebody went back to Johnson's house and took a rocking chair out of the house and put it in the back of a pickup in the garage and covered the windows and set up a perimeter. They set up a perimeter with cans and rope around the outside of the garage so that if somebody hit the rope they'd make noise.

And he set up a perimeter, and he renourished, baked a potato in the wood stove because once you've set up your perimeter and you've got a guard out, that's what you do in Vietnam, you renourish and rest while your buddies stand guard duty, only Jim had to play all the roles. He was playing all the roles that night. He was on guard duty while he was resting and renourishing because he didn't have any friendly troops with him.

And he was still in a free fire zone, and at some point he had to go out and do some

The perimeter, potato, and tire evidence (hereinafter referred to as the "perimeter evidence") unraveled early in the trial. The fourth witness in the State's case in chief, a highway patrolman, testified that he was the one who set up the tin-can perimeter and left the foil in the garage. He had taken these measures while watching the Johnson house in case Johnson returned there after the rampage. The next witness, another highway patrolman, testified that he saw yet another officer let the air out of the tires of Johnson's vehicle to disable it and prevent **Johnson** from using it. From that point on, defense counsel conceded that Johnson had nothing to do with the perimeter evidence. In closing argument, the State capitalized on defense counsel's mistake by contending that it was one of the many ways that Johnson had lied in order to maintain the PTSD defense.

The claim of prosecutorial misconduct is that the prosecutor "sandbagged" defense counsel into believing that Johnson was responsible for the perimeter evidence and that the failure to disclose the truth about that evidence was an intentional misrepresentation. The authorities had questioned Johnson's wife about this evidence, and there was apparently some passing mention of the evidence in the police reports, although at no time did the State indicate that the evidence was attributable to the highway patrolmen, rather than Johnson. The reasonable implication was that Johnson, himself, set up the perimeter, baked the potato and flattened the tires; otherwise, there would have been

no reason to mention the evidence in the reports. The implication was born out further by the fact that the tin-can-rope perimeter was listed in the reports as one of the items collected by the evidence technicians, as if the items somehow linked Johnson to the crimes. Due to an obvious lack of communication, the authorities were themselves confused about this evidence, but regardless, the erroneous implication was never corrected.

According to defense counsel, the problem was compounded by the prosecutor's passive conduct during a deposition of Johnson's wife taken a week before trial. At the deposition, defense counsel interrogated Johnson's wife extensively about the perimeter evidence, and she speculated that Johnson must have been responsible for it. Although two prosecutors were present for the deposition, neither made any effort to correct defense counsel's and Johnson's wife's mistaken impression.

Defense counsel claims to have been further misled by the fact that an investigator for the State advised that the two highway patrolmen, who had been endorsed as witnesses, were only involved in the collection of some of the physical evidence, and would testify solely on chain of custody issues. As a result of this representation, defense counsel did not question the two patrolmen before trial.

The corresponding claim of ineffective assistance of counsel is in large part the converse of the claim of prosecutorial miscon-

recon and he had to—he had to do some reconnaissances and see what was going on and see who was there. And when he went on his recon mission, he thought, I'd better abandon and destroy this car, take the car, get rid of the car, but destroy the car, disable the car so the enemy can't use it. So he flattened the tires, and that's what they taught them to do in the jungle. You've got to abandon equipment, disable it so the enemy can't use it against you, so he did.

And then he went to look for some support troops.... And when he got to where he could find support troops, there weren't any. And there was still enemy and the enemy was calling in, and he had to take out the radio and he took out the radio.

And now its time to do some more recon, and he sees the VC coming out of the bunk-

er.... And he's in a free fire zone and he shoots, and he has to escape and evade then.... And he tries to escape and evade, and he sees another dink and shoots that dink.

And he looks for a safe haven and finds the porch of Mrs. Miller and he rests.... Now, Jim Johnson is going to tell you what he remembers of that night, and he's not going to talk to you about escape and evade, search and destroy, kill the leader and how the army taught him that because he—he doesn't really remember most of those things from the army. He's tried to forget everything from the army, but it's still there.

And the psychologists are going to come in, and the military experts are going to come in and talk to you about how consistent all of what happened that night was with the Vietnam experience for Jim Johnson.

duct: Defense counsel should not have relied on the inference from the police reports, the suggestive silence of the prosecutors at the deposition, and the representation regarding the highway patrolmen. Defense counsel, in other words, made too many assumptions about the perimeter evidence without adequately investigating the facts, and failed to conduct a proper investigation that, at the least, should have included interviews with the two highway patrolmen because they were endorsed witnesses.

To refute these claims, the State offers several theories. At the outset, the State maintains that the evidence withheld was not evidence favorable to the defendant so to require disclosure under the familiar rule of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). While proof that Johnson was responsible for the perimeter evidence would, perhaps, have been exculpatory, the testimony of the highway patrolman most assuredly was not.

In addition, the State submits that there can be no prosecutorial misconduct for failure to disclose evidence where, as here, defense counsel filed no formal request for discovery and discovery was handled solely on an informal basis. Moreover, the State contends that even if counsel had filed a formal request, Rule 25.03 requires only that the State disclose the names, last known addresses and existing statements of the witnesses. Because the State had already voluntarily disclosed all reports required under Rule 25.03, the State concludes that a formal discovery request would have been fruitless.

Next, the State suggests that it could not have anticipated that defense counsel would attribute the perimeter evidence to Johnson's paranoia. Until defense counsel's opening statement, as the State explains, the patrolmen's testimony had no significance. It was for that reason, too, that the State claims an excuse for its earlier representation that the highway patrolmen were only involved in the collection of physical evidence. According to the State, that representation, when made, was entirely true.

On the claim of ineffective assistance of counsel, the State argues that it was not unreasonable for defense counsel to conclude that the perimeter evidence was Johnson's handiwork. No other explanation of this evidence was apparent, there was no evidence to the contrary, and no further investigation suggested itself. Moreover, the implication that Johnson was responsible for the perimeter, evidence, and his professed inability to remember his involvement, were entirely consistent with the PTSD defense.

Though this Court does not condone the conduct of the State in failing to correct the erroneous implication from its own confusion about the perimeter evidence, nor the conduct of defense counsel in failing to further investigate the source of the perimeter evidence, it is unnecessary to address these issues definitively on their merits. Johnson did not raise the issue of prosecutorial misconduct until after trial, and therefore, this Court reviews for plain error only. As stated, plain error relief will only be granted if manifest injustice or a miscarriage of justice resulted from the error. *Rule 30.20* ; *Simmons*, 955 S.W.2d at 736. For his claim of ineffective assistance of counsel, Johnson must show a reasonable probability that but for his counsel's allegedly unprofessional errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 689–90, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984). For the reasons that follow, this Court holds that defense counsel's mistaken use of the perimeter evidence, even if that use was the result of prosecutorial misconduct or ineffective assistance of counsel, did not give rise to manifest injustice or a reasonable probability that the outcome of the trial would have been different.

First and foremost, the mistake did not preclude Johnson from maintaining the PTSD defense. Johnson's PTSD experts testified that the existence and effect of the disorder did not depend on the perimeter evidence and that the perimeter evidence would have been only minor corroboration for the theory.

In addition, defense counsel had shown some caution in attributing the perimeter evidence to Johnson, he did not press the point once he realized that it was not supported by the evidence, and he tacitly ex-

plained the mistake to the jury. During opening statement, trial counsel prefaced his reference to this evidence with the caveat, "[a]nd he doesn't remember particularly" and then hedged somewhat in describing the evidence by stating that *somebody* went back to Johnson's house ..." (emphasis added). To be sure, the highway patrolman testified that he was the someone in question, but defense counsel made it known to the jury that he had been unaware of that fact by eliciting on cross-examination that the patrolman had submitted no report. Likewise, when the State proved that another patrolman had flattened the tires, defense counsel made it clear to the jury that he had been unaware of the patrolman's involvement because the report stated only that the tires had been flattened. Furthermore, when Johnson, himself, took the stand, he testified that he had never told defense counsel that he was responsible for the perimeter evidence and that he simply did not remember one way or the other. These developments not only took the sting out of the State's claim that defense counsel had lied about this evidence but also, in effect, bolstered defense counsel's contention that Johnson indeed suffered from a "disassociative state," a symptom of which, as his experts claimed, was an inability to remember events that took place during the "disassociative state."

Most likely, the defense theory failed not because of the mistaken use of the perimeter evidence, but on the overall weakness of the theory itself and the proof offered in support of the theory. The essence of the PTSD theory, as stated, was that Johnson was suffering from Vietnam-related flashbacks and was in a "disassociative state," a mental illness that prevented him from comprehending the wrongfulness of his conduct. From our close review of the record, it appears that the State, in both the cross-examination of the defense experts and the presentation of its own experts, was highly effective in exposing the weaknesses of the defense.

Moreover, the State was even more effective simply by emphasizing the raw facts. One particularly persuasive point focused on the confession Johnson made to the authorities shortly after his arrest, a confession in which Johnson recalled in much detail that his targets were the sheriff and his deputies, not the Viet Cong. He explained to the authorities how the deputy had come to his house regarding a domestic disturbance, and how, after a brief confrontation, he "snapped" and shot the deputy. In this regard, he recounted details such as the deputy's distance from the house and the deputy's actions when Johnson began shooting, and that he went back in his house after the shooting and told his wife he was in trouble. To explain his conduct to the authorities, he related that "I knew I had a job to do because [Sheriff] Kenny [Jones] let me down," an apparent reference to the fact that Johnson and the sheriff had disagreed on how to handle the ongoing difficulties with Johnson's stepdaughter. Next, Johnson told the authorities that after shooting the deputy, he drove to the residence of Sheriff Jones. Although he didn't see the sheriff, he did see his wife, Pam, and he shot her instead. He then tried to locate Deputy Connell, but was unsuccessful. Subsequently, he went to the sheriff's office but did not stop because too many officers had gathered there. He later made his way to Deputy Borts' house with the intention of turning himself in, but when he heard Borts mention his name while talking on the phone, he shot him as well. On his return to the sheriff's office, he stated that he saw officers running out the door and, believing that they were coming after him, he opened fire again.

Tellingly, Johnson referred to his Vietnam experiences only once during the confession. He stated only that "I could see everything about Nam."

Johnson's detailed and intimate recitation of these events, together with his stated reasons for his conduct, seems wholly inconsistent with the defense of mental disease or defect. In effect, Johnson admitted that he had known what he was doing and why, and consequently, he was hard pressed at trial to fit the facts to the theory. In the end, this was the likely reason why the defense failed.

Johnson's claims of prosecutorial misconduct and ineffective assistance of counsel are denied.

## B. Testimony of Dr. Guindon

 As part of the State's rebuttal of Johnson's defense, the State called Dr. Kurt Guindon, a psychologist. Dr. Guindon had been hired by the defense to conduct a psychological evaluation of Johnson some time shortly after the murders. After performing the evaluation, Dr. Guindon determined that Johnson did not have PTSD, but he did diagnose a borderline personality disorder with paranoid features. Because a borderline personality disorder diagnosis would be insufficient to relieve Johnson of criminal responsibility for his conduct, the defense decided against using Dr. Guindon as an expert. Prior to the trial, however, Dr. Guindon contacted a newspaper reporter and related that he had performed an evaluation of Johnson, and thereafter, Dr. Guindon was interviewed by newspapers, television, radio stations, and the State as well.

Johnson now claims that the trial court plainly erred by failing to declare a mistrial when Dr. Guindon testified and when Johnson and the defense experts were questioned on cross-examination about Dr. Guindon's evaluation. Johnson also claims that the Rule 29.15 court clearly erred when it did not find defense counsel ineffective for failing to preserve the error and when it did not find prosecutorial misconduct for using Dr. Guindon's evaluation and conclusions.

 In particular, Johnson contends that Dr. Guindon's testimony violated both the American Medical Association's ("AMA") Principles of Ethics and the physician-patient privilege set out in section 491.060, RSMo 1994. We disagree. It is not the role of this Court to enforce the ethics of the AMA nor to police its membership. Furthermore, the physician-patient privilege is waived in cases such as this, where the defendant puts his mental status in issue. *State v. Skillicorn*, 944 S.W.2d 877, 897 (Mo. banc 1997). More precisely, "when a party once places the question of his mental condition in issue he thereby waives the ***physician-patient*** privilege to exclude testimony of any doctors who have examined him for that purpose." *State v. Carter*, 641 S.W.2d 54, 57 (Mo. banc 1982). A defendant cannot call those doctors who support his position and then try to prevent the testimony of other doctors who examined him for the same condition. *Id.* at 57 (citing *State v. Sapp*, 356 Mo. 705, 203 S.W.2d 425, 429 (1947)). Because Dr. Guindon's ethical standards are not at issue and because Johnson waived any privilege that would prevent Dr. Guindon from testifying, there was no error. The point is denied.

## C. Excluded Defense Evidence

 Johnson next contends that the trial court erred when it excluded the testimony of several of Johnson's character witnesses, and thereby denied him his right to defend himself. However, Johnson's counsel made an oral offer of proof that did not distinguish the testimony of the proposed witnesses from that of the five character witnesses who had already testified. Moreover, although the trial court determined that the proposed witnesses' testimony would be cumulative, the court still permitted two more character witnesses to testify. Under these circumstances, there was no abuse of discretion. *State v. Kinder*, 942 S.W.2d 313, 336 (Mo. banc 1996).

## D. Requests for Plain Error Relief

 Johnson contends that a great amount of evidence was improperly admitted and was so prejudicial that it amounted to plain error. Admission of the evidence, he adds, violated his rights to due process and freedom from cruel and unusual punishment. The most prominent of that evidence includes: 1) the admission of tapes and a transcript of a recorded conversation between Johnson and a negotiator; 2) the negotiator's testimony explaining various parts of the tape that were not clear; and 3) the admission of Johnson's confession, and the written report prepared by the officer who elicited Johnson's confession. Additionally, Johnson complains that the State engaged in a wide variety of allegedly improper questions and comments throughout the guilt phase, from opening statements through closing argument. Those questions and comments included: 1) a comment on Johnson's right to remain silent, 2) a statement that Johnson held Mrs. Miller "and the entire town of California hostage," 3) speculation on the

possible testimony of Vietnam veterans who were not called as witnesses, 4) a comment that Johnson's defense was a "slap to every veteran," 5) a comment referring to God, 6) a question that suggested that Johnson was faking PTSD, 7) a question about the percentage of persons in the United States who suffer from insomnia, and 8) a question whether Johnson's demeanor at work had changed so that he might be fired and receive unemployment compensation.

Johnson also asks for plain error review regarding the exclusion of certain evidence concerning his background and reputation. The exclusion, he claims, prevented him from presenting a defense and thus deprived him of his rights to due process and freedom from cruel and unusual punishment. The evidence, nearly all of which was cumulative, included the following: 1) Johnson's reputation in the community, 2) specific examples of good acts by Johnson, 3) whether Johnson attended church; 4) Johnson's treatment of his wife Jerri Wilson, 4) people's reaction to the news of the murders and that Johnson was suspected, 5) why Johnson's friends believed that he could not have done the murders, 6) how Johnson normally behaves, 7) how Johnson reacted to the death of his friend Dallas Cooper, and 8) the morale of Johnson's unit in Vietnam.

As stated, no objections were made to any of the evidence admitted nor to any of the State's allegedly improper comments and questions. Furthermore, Johnson failed to preserve the alleged error regarding the exclusion of some of his background and character evidence. This Court declines to undertake plain error review because there has been no showing of manifest injustice or miscarriage of justice. *Rule 30.20* ; *Simmons*, 955 S.W.2d at 736. Johnson's corresponding claims of ineffective assistance of counsel for failing to raise objections are denied because he has shown no reasonable probability that the result of the trial would have been different.

### III. PENALTY PHASE

#### A. Alternate Juror Sitting in the Penalty Phase

■ Johnson claims that the trial court erred in allowing, over his objection, an alternate juror to sit in the penalty phase only and that the Rule 29.15 court also erred in not finding that Johnson's counsel was ineffective for failing to request a mistrial when the alternate juror was seated. Section 494.485, RSMo 1994, which addresses the use of alternate jurors, states in pertinent part that "[a]lternate jurors who do not replace principal jurors shall be discharged after the jury retires to consider its verdict." Because the trial in a capital case is bifurcated and involves two verdicts instead of one, it is unclear whether the statute applies to one or the other of the verdicts, or both. Such ambiguities must be resolved by reference to legislative intent, as reflected in the language used in the statute. *Akers v. Warson Garden Apartments*, 961 S.W.2d 50 (Mo. banc 1998) (No. 80240, January 27, 1998). The overriding intent of section 494.485 is to provide for the use of alternate jurors so as to prevent mistrials caused by the loss of a regular juror. The only statutory exception to the use of alternate jurors applies when deliberations have already begun. Allowing juror replacement during penalty phase, but before the jury retires to deliberate, is entirely consistent with both the legislative purpose of preventing mistrials and the statutory exception. This Court concludes that the legislature intended to afford the same protection against mistrials in bifurcated cases that it afforded in non-bifurcated cases; therefore, alternate jurors may properly serve in penalty phase deliberations only. This conclusion, of course, is also entirely consistent with the practice of conducting penalty phase trials with completely new juries whenever the imposition of the death penalty is overturned on appeal. The point is denied.

#### B. Allegedly Improper Closing Argument

■ As in voir dire and the guilt phase, Johnson claims that several comments made by the State during closing arguments constituted prosecutorial misconduct, that defense counsel was ineffective for failing to object, and that the trial court plainly erred in not ordering a mistrial *sua sponte*. Those comments include: 1) that this case was the

first time that the prosecutor had ever requested the death penalty and that there were several reasons why the death penalty was being requested; 2) that after Johnson killed Officer Roark, he was a murderer and that by the end of the night he had a significant criminal history; 3) that peace officers should not have to worry that their job endangers their families; 4) that Johnson's mother was a victim of his crimes; and 5) that the officers who returned fire at Johnson would have been justified if they had killed him and that the officers would have been lauded as heroes. In addition, Johnson complains of several instances where the State allegedly personalized the argument and one instance where the State asked the jury to consider "whose life has more value."

No objection was made to any of these comments. Even if the comments were erroneous, which is a tenuous proposition, this Court declines to undertake plain error review because no manifest injustice or miscarriage of justice resulted. *Rule 30.20*; *Simmons*, 955 S.W.2d at 736. This point is denied.

### C. Failure to Investigate and Present Evidence

▆▆▆ Johnson next alleges that his trial counsel was ineffective for failing to investigate and present Johnson's early childhood experiences—that he was the victim of a cold, unloving family—in mitigation of punishment. He contends that those early experiences show that Johnson had a predisposition to PTSD and would have convinced the jury that his conduct did not warrant death. However, defense counsel was well aware of those early childhood experiences as a result of talking to Johnson, himself, and elected to pursue a different strategy of presenting Johnson as the product of a good Christian family. This was reasonable trial strategy that defense counsel developed from his discussions with Johnson, and at trial, counsel called numerous witnesses to support that strategy. The suggested testimony would have wholly contradicted the reasonable trial strategy that was actually used. It would have been counterproductive to search for more witnesses who would contradict that

reasonable trial strategy. The point is denied.

### D. Jury Instructions

Johnson also claims that the reasonable doubt instructions given in both the guilt phase and the penalty phase are constitutionally infirm. The instructions are based on MAI–CR3d 302.04 and MAI–CR3d 313.03 respectively. This argument has been repeatedly rejected by this Court. *See, e.g., State v. Hall,* 955 S.W.2d 198, 206 (Mo. banc 1997); *State v. Debler,* 856 S.W.2d 641, 652 (Mo. banc 1993). In addition, Johnson claims that the mitigating circumstance instruction given in the penalty phase, which is based on MAI–CR3d 313.44B, is unconstitutional because the "may consider" language misleads the jury. This argument has also been clearly rejected by this Court. *Debler,* 856 S.W.2d at 655.

▆▆▆ Johnson next argues that the depravity of the mind aggravator, the dangerous weapon aggravator, and a third aggravator concerning the attempted homicide of Officer John Ernst, all submitted to the jury during the penalty phase, were vague, duplicative, and unsupported by the evidence. Initially, we note that a finding of only one aggravating circumstance is necessary to support imposition of the death penalty. *State v. Smith,* 944 S.W.2d 901, 921 (Mo. banc 1997); *State v. Weaver,* 912 S.W.2d 499, 522 (Mo. banc 1995). In three of the four counts of murder, the jury found the existence of the statutory aggravator that a peace officer was murdered in the line of duty, and Johnson does not dispute the applicability of that aggravator. As to the fourth Count, we need only look at the dangerous weapon aggravator, which was one of the two aggravators submitted. To support the dangerous weapon aggravator, it must be shown that the defendant used a weapon or device to endanger more than one person. *State v. Kenley,* 952 S.W.2d 250, 275 (Mo. banc 1997). The evidence supporting the dangerous weapon aggravator showed that Johnson fired six times with a semi-automatic rifle on a group of people; only one person was injured but all were endangered. This evi-

dence was more than sufficient. The point is denied.

## IV. BOMB THREAT AND OTHER ALLEGED DISTRACTIONS

Johnson alleges that the trial court plainly erred by failing to declare a mistrial *sua sponte* when a bomb threat forced the court to suspend voir dire for a day, when the State mentioned the bomb threat during its penalty phase closing argument, when the jurors were forced to walk by a graveside tent during the trial, when officers "filled the court room," and when a prayer and scripture were read in the jury room at the beginning of guilt phase deliberations. Johnson also alleges that his counsel was ineffective for failing to object to these situations.

▇▇▇▇ "A mistrial is a drastic remedy, granted only in extraordinary circumstances." *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994). Because the trial court is in a better position to observe the evidence and its impact, the granting of a mistrial rests within its sound discretion. Appellate review is for abuse of discretion only. *Parker*, 886 S.W.2d at 922.

▇▇▇▇ In this case, the circumstances about which Johnson complains do not merit reversal. After the bomb threat was resolved, the trial court made sure that no one had read or heard anything about the matter and assured everyone that all safety precautions were being taken. No juror who had heard anything or had admitted to being scared was selected to be on the jury. In addition, the State's comments in the closing argument were not objected to and there is no support in the record for the court to have declared a mistrial *sua sponte*. The evidence concerning the graveside tent shows that Johnson has greatly exaggerated his claim. The tent was near the main entrance which faces west, but the jurors entered from a south entrance; there was clearly no prejudice from such limited exposure. As to the alleged "sea of peace officers" during the trial, Johnson has again shown no prejudice. The record shows that many of the officers were out of uniform and at least some of those in uniform were present for security purposes, required in view of the bomb

threat and the nature of the trial. Moreover, the trial court was present and was in a better position to determine the impact of the officers' presence. *State v. Clover*, 924 S.W.2d 853, 856 (Mo. banc 1996). The last claim, that the jurors prayed and read scripture at the beginning of the guilt phase determination, is not subject to challenge. The law is clear: jurors may not impeach the verdict with testimony ' "of any partiality or misconduct that transpired [in the jury room], nor speak of the motives which induced or operated to produce the verdict.' " *State v. Babb*, 680 S.W.2d 150, 152 (Mo. banc 1984), *citing State v. Underwood*, 57 Mo. 40, 52 (1874). In sum, this Court concludes that the trial court did not abuse its discretion in failing to declare a mistrial *sua sponte* and that defense counsel was not ineffective for failing to raise objections.

## V. PROPORTIONALITY REVIEW

Finally, Johnson contends that the death sentence is improper because this Court does not engage in a meaningful proportionality review. Particularly, he claims 1) that this Court does not afford adequate notice with a meaningful opportunity to be heard on the proportionality issue, 2) that this Court does not maintain a complete database of cases as required by section 565.035 because cases in which life sentences are imposed are not included, and 3) that "similar cases" is an undefined criterion. Johnson also complains that his death sentence is improper because the prosecutor has unlimited discretion in seeking the death penalty. Furthermore, he contends that the sentence in this case is excessive and disproportionate.

▇▇▇▇ The purpose of the proportionality review, as this Court has repeatedly explained, is merely to prevent freakish and wanton applications of the death penalty. *Parker*, 886 S.W.2d at 933. The review performed sufficiently meets that standard. *See State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993); *see also Zeitvogel v. Delo*, 84 F.3d 276, 284 (8th Cir.1996) (upholding this Court's proportionality review). The process for the review is clearly stated in the statute and in past cases, and its repetition offers no

precedential value. *See Parker*, 886 S.W.2d at 933–34; *Ramsey*, 864 S.W.2d at 328. Additionally, any due process claims, such as the ones Johnson brings here, have already been rejected by this Court. *Weaver*, 912 S.W.2d at 522. Claims contesting the adequacy of the database as a factor in the proportionality review have also previously been rejected. *Parker*, 886 S.W.2d at 933; *State v. Whitfield*, 837 S.W.2d 503, 515 (Mo. banc 1992). Thus, Johnson's only remaining point is that imposition of the death penalty in his case is excessive and disproportionate.

 After careful review of the record, this Court holds that the trial court's imposition of the death sentence did not result from the influence of passion, prejudice, or any other arbitrary factor. *See* section 565.035.3(1). The jury unanimously found one statutory aggravator in the murder of Officer Roark: that the murder was committed against a peace officer while engaged in the performance of his official duty. The jury unanimously found two statutory aggravators in the murder of Pamela Jones: 1) that Johnson by his act of murdering Pamela J. Jones knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person; and 2) that the murder involved depravity of the mind and was outrageously and wantonly vile, horrible, and inhuman, and exhibited a callous disregard for the sanctity of all human life. The jury unanimously found four statutory aggravators in the murder of Officer Charles R. Smith: 1) that the murder was committed while Johnson was engaged in the attempted commission of another unlawful homicide; 2) that by murdering Smith, Johnson knowingly created a great risk of death to more than one person by using a weapon that would normally be hazardous to the lives of more than one person; 3) that the murder involved depravity of the mind, was outrageously and wantonly vile, horrible, and inhuman, and exhibited a callous disregard for the sanctity of all human life; and 4) that the murder was committed against a peace officer while engaged in the performance of his official duty. The jury unanimously found two statutory aggravators in the murder of Sandra B. Wilson: 1) that the murder involved depravity of the mind, was outrageously and wantonly vile, horrible, and inhuman, and exhibited a callous disregard for the sanctity of all human life; and 2) that the murder was committed against a peace officer while engaged in the performance of her official duty. The finding of these aggravators is amply supported by the evidence.

 In addition, the death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. Johnson shot one victim in the back as he was leaving and then came back moments later to finish the murder. He shot another victim through a window while she was sitting in a group of people. He shot another victim while he was leaving the police station. He shot his final victim in the back while she was climbing from her police car. Defendants in similar cases who kill peace officers are often sentenced to death. *See, e.g., State v. Sweet*, 796 S.W.2d 607, 617 (Mo. banc 1990); *State v. Mallett*, 732 S.W.2d 527 (Mo. banc 1987); *State v. Driscoll*, 711 S.W.2d 512 (Mo. banc 1986); *State v. Roberts*, 709 S.W.2d 857 (Mo. banc 1986); *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983). Furthermore, a sentence of death is often imposed where the defendant murdered more than one person. *See, e.g., State v. Clemons*, 946 S.W.2d 206, 233 (Mo. banc 1997); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993); *State v. Mease*, 842 S.W.2d 98 (Mo. banc 1992); *State v. Hunter*, 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992); *State v. Powell*, 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese*, 795 S.W.2d 69 (Mo. banc 1990); *State v. Sloan*, 756 S.W.2d 503 (Mo. banc 1988); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988); *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985); *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984). Accordingly, the sentences of death in this case are not disproportionate.

## VI.

For the foregoing reasons, the judgments are affirmed.

BENTON, C.J., PRICE and ROBERTSON, JJ., concur.

WHITE, J., dissents in separate opinion filed.

COVINGTON and HOLSTEIN, JJ., not sitting.

WHITE, Judge, dissenting.

While I would find the result troubling, I am compelled, nevertheless, to dissent. Defense counsel's unprofessional failure to interview Officers Opperman and Breen led the defense to make demonstrably false claims in its opening statement, claims that utterly destroyed the credibility of the PTSD theory before the defense even presented any evidence. While defendant has not, perhaps, demonstrated that this was outcome-determinative prejudice, as the majority opinion requires, that standard is too high. Under the proper standard, given the vagaries of a mental illness defense, I am convinced that there is a reasonable likelihood that, but for counsel's unprofessional errors, the result of either the guilt or sentencing phases of the trial would have been different.

### Unprofessional Conduct

While the conduct of the prosecution in this matter is, as the principal opinion notes, not especially praiseworthy, the evidence of purposeful, prosecutorial misconduct is equivocal, at best, and I am reluctant to condemn the prosecution on this record. As to the defense counsel, however, I have no such reservations.

Although the principal opinion is correct in pointing out that defense counsel was initially careful in attributing the perimeter evidence to Mr. Johnson ("somebody went back to Johnson's house"), all caution was quickly abandoned as the defense told the jury, in no uncertain terms, that the defendant was that somebody:

> he set up a perimeter . . . ., that's what you do in Vietnam, you renourish and rest while your buddies stand guard duty, only Jim had to play all the roles. . . . He was on guard duty while he was resting and renourishing. . . . And when he went on his recon mission, he thought, I'd better

> . . . disable the car so the enemy can't use it. So he flattened the tires. . . .

Intent as they were on making such extravagant claims about what this behavior revealed about their client's mental state, the defense team was remarkably cavalier in determining whether these assertions had any basis in fact. While it is true, as the State argues, that no evidence in the defense's possession indicated that someone else had done these things, no evidence pointed to Mr. Johnson, either. As defense counsel testified at the Rule 29.15 hearing, the defense decided that Mr. Johnson was responsible because it fit their experts' theory about what sort of behavior he might have engaged in: "the experts . . . thought that was a great piece of evidence for their testimony." Thus, the defense made the mistake of assuming that the evidence would show what they hoped it would show, instead of investigating to see what actually might be determined.

Even minimal investigation would have sufficed. The defense team was not required to depose every single endorsed witness. But the defense, if it was inclined to make so much of what went on in James Johnson's garage on the night of December 8th, was obliged to at least ascertain who was present at that location, and, at the very least, to interview those persons. Similarly, if the defense thought that the tire evidence was important, it should reasonably have attempted to contact a person who could confirm that the tires were, in fact, flat when the car was first found by the authorities. These witnesses were not hard to find. As defense counsel noted, he had nagging questions about why these particular officers had been endorsed and repeatedly asked the prosecution who they were. While the prosecution's investigator did apparently say "that they were just chain people and probably aren't going to use them, etc., etc." the equivocal answer of an opposing investigator does not relieve a reasonably diligent and cautious advocate of the duty to at least pick up the phone and ask these witnesses what their connection to the case was. Defense counsel did not do even that, and it caused them to make a critical error from which the defense never recovered.

While it may be true that the prosecution sprang a trap on the defense, it was a trap that defense counsel helped set through inadequate preparation and investigation and armed through its own overblown, factually unsupported statements about what happened the night of the killings. Reasonably cautious and zealous advocates would not have been so easily misled.

### Prejudice

The principal opinion does not endorse the behavior of either side and, at least implicitly, recognizes that some breakdown in professionalism probably occurred here. Hence, where I really differ from the principal opinion is on the issue of prejudice. The majority applies too high a standard.

While the prejudice standard is, as the majority states, whether there was a "reasonable probability" of a different result,[1] the principal opinion actually seems to be applying an outcome-determinative standard. *Strickland* explicitly rejects an outcome-determinative standard.[2] Thus, Mr. Johnson is not required to show that his counsel's unprofessional errors are the "most likely" reason why his defense failed, as the principal opinion holds. The United States Supreme Court reiterated this as recently as 1995, contrasting the "reasonable probability of a different result" standard with the higher, outcome-determinative standard, and also noting that this is not merely a sufficiency of the evidence standard.[3] The majority seems to apply the latter standard. Tellingly, for a case based entirely on a defense of mental illness, the principal opinion's review of the evidence does not mention any of the testimony of the three defense PTSD experts, instead choosing to focus solely on the inculpatory "raw facts." This disregard for essentially the entire defense case in assessing prejudice reflects an improper, sufficiency of the evidence standard. Certainly, I do not understand the principal opinion to hold that there is overwhelming evidence that Mr. Johnson was legally sane at the time of the killings. While I agree that there was suffi-

cient evidence to convict, and am not necessarily convinced that the weakness of the case was not the "most likely" reason the defense failed, I find it is reasonably likely that a jury that had not seen the defense destroy its own credibility on this issue would have been sufficiently receptive to the expert diagnosis of a mental disease or defect to permit a reasonable likelihood of a different result.

As to the idea that the defense was able to mitigate the effects of its gaffe, I am unconvinced. The fact that the defense elicited testimony from the officers and the defendant explaining why the defense did not know that their client had not constructed the perimeter, and the fact that defense had their experts testify that the perimeter evidence was not important in their diagnosis of Mr. Johnson actually indicates the opposite. In my view, these efforts to distance the defense from this evidence show that the defense team knew how badly its credibility had been damaged and spent the entire trial vainly attempting to recover some shred of believability. In particular, the prosecutor, in his closing argument, did not think that the failure to ascertain who had created the perimeter evidence was unimportant. The prosecution's tactic in rebuttal was to "flash back" to defense counsel's opening argument and to recount what the defense had "promised" to prove to the jury. After reading at great length from defense's opening statement, the prosecutor vividly captured the devastating effect that statement had on the entire defense case: "Pure unadulterated lies to you. We have disproven each and every fact that the Defense said they were going to sell you on this Vietnam defense. The only land mines that this case is about are the ones the Defense has been stepping on all week."

Obviously, there is no question that Mr. Johnson killed the victims here. The question is whether he was sane when he did so. There was expert psychological testimony on both sides. I cannot say that it is not at

1. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

2. *Id.* at 693–94, 104 S.Ct. at 2067–68.

3. *Kyles v. Whitley*, 514 U.S. 419, 432–36, 115 S.Ct. 1555, 1565–66, 131 L.Ed.2d 490 (1995).

least reasonably likely that a jury would have believed the PTSD theory if Mr. Johnson's counsel had not utterly discredited himself and the theory by tying it and the defense into a completely concocted scenario at the very outset of the case.

### Penalty Phase Prejudice

Even more troubling to me is an issue that the principal opinion does not address: "When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors [of counsel], the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[4] Clearly, the aggravating factors here are extremely grave. But there are clear mitigating factors as well: Mr. Johnson's previously law-abiding life, his service to his country, at least. While a reasonable juror might have felt that Mr. Johnson's mental difficulties did not rise to the level of legal insanity, it is reasonably likely that such a juror would find those mental problems, combined with Mr. Johnson's previous positive contribution to society sufficiently mitigating to warrant a sentence of life. Any such tendency was severely undercut by defense counsel's opening argument, which left the jury with the strong impression that any claims of emotional distress by Mr. Johnson were made up out of whole cloth. Absent this unprofessional error, it is at least reasonably likely that a jury would have found the balance of mitigating and aggravating factors differently.

### Conclusion

This is a very hard case. If Mr. Johnson was in control of his faculties when he went on this murderous rampage, then he assuredly deserves the death sentence he was given. But the question of what Mr. Johnson's mental status was on that night is not susceptible of easy answers. While Mr. Johnson may not, as the jury found, have met the legal definition of insanity, whatever drove Mr. Johnson to go from being a law-abiding citizen to being a multiple killer was certainly something akin to madness. I am not con-

vinced that the performance of his counsel did not rob Mr. Johnson of any opportunity he might have had to convince the jury that he was not responsible for his actions. This is an excellent example of why hard cases make bad law. While I share the majority's horror at this carnage, I cannot uphold this as an acceptable standard of representation for a defendant accused of capital murder.

I would hold that Mr. Johnson received ineffective assistance of counsel, was prejudiced thereby, and is entitled to a retrial.

---

**4.** *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068– 69.