STATE of Missouri, Respondent,

v.

John E. WINFIELD, Appellant.

No. SC 81165.

Supreme Court of Missouri,
En Banc.

Nov. 9, 1999.

Rehearing Denied Dec. 7, 1999.

William J. Swift, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl Caponegro Nield, Asst. Atty. Gen., Jefferson City, for respondent.

JOHN C. HOLSTEIN, Judge.

Defendant, John Winfield, was convicted by a St. Louis County jury of two counts of first degree murder, two counts of first degree assault, and four counts of armed criminal action. The circuit court sentenced defendant to two death sentences, life and fifteen years, and four seventy-five year sentences for the crimes respectively. Defendant challenges his convictions.

This Court has exclusive appellate jurisdiction. *Mo. Const., art. V, sec. 3.* The judgment is affirmed.

### FACTS

This Court reviews the facts in the light most favorable to the verdict. *State v. Clark*, 981 S.W.2d 143, 145 (Mo. banc 1998). In September 1996, defendant lived in a St. Louis County home one block from a second floor apartment where his ex-girlfriend and mother of his children, Carmelita Donald, lived. Living with Carmelita and her children were Carmelita's sister, Melody Donald, and friend Arthea Sanders. In the apartment below them lived their friend, Shawnee Murphy, and her three children.

Defendant began dating Carmelita in 1989 and continued to have an on-and-off relationship with her through the spring of 1996. During that time, they had two children over whom they shared physical custody. In the late summer of 1996, Carmelita began dating Tony Reynolds. They succeeded in keeping that relationship a secret from defendant for about a month. On the night of September 9, 1996, Carmelita went out for the evening with Reynolds. Meanwhile, defendant began making a series of calls to Carmelita's apartment asking Melody about her sister's whereabouts and instructing her to have Carmelita call him when she returned home. Melody told defendant that she did not know where Carmelita was.

Shortly thereafter, defendant went to the apartment and began inquiring further about Carmelita. Melody again replied that she did not know where Carmelita could be found. He made a phone call and left the apartment for approximately ten minutes. He returned with Arthea, who had been drinking. Once inside, he tried once more to find out where Carmelita had gone. One last time, Melody informed defendant that she did not know. At some point, Arthea, who knew Carmelita was out with Tony Reynolds, took Melody aside and told her where Carmelita was

and to lie to defendant by telling him that Carmelita was at Arthea's mother's house. Apparently, the pair believed this would satisfy the already agitated defendant and get him to return home. Eventually, Melody went downstairs to Shawnee's apartment to call Arthea's parents to tell them of the story they had concocted. In Shawnee's apartment, Melody found Shawnee, her three children, and a guest, James Johnson. While there, Melody heard a crashing sound coming from her apartment upstairs. When she returned to the upstairs apartment, Melody found the entertainment center "knocked over" and broken. Defendant then asked Melody how she could do this to him. She denied knowing what he was talking about. Melody returned to Shawnee's apartment and reported that defendant was upstairs turning over furniture because he was angry about Carmelita being absent. The two women decided to go back upstairs. Defendant began pacing the apartment. He became increasingly agitated and angry, at one point making threats toward Carmelita.

Around midnight, Carmelita returned to the apartment with Tony Reynolds. They saw defendant's white Cadillac parked in front. To avoid trouble with defendant, they drove to Reynolds' female cousin's house. There they persuaded her to drive Carmelita home. When the two women arrived back at Carmelita's apartment, defendant's car was still there. As Carmelita started to climb the stairs to her apartment, defendant came down, said he needed a word, and pushed her down the stairs. They walked outside, and defendant asked Carmelita about her relationship with Tony Reynolds. Meanwhile, Arthea walked outside and slashed the tires on defendant's car. Upon her return to the downstairs apartment, Arthea told Melody to call the police and yelled outside, asking Carmelita if she was alright. Carmelita said she was fine. Despite Arthea's request, Melody did not call the police.

A car door "slammed" shut. Melody assumed it was defendant leaving. However, defendant had run into the downstairs apartment, Carmelita in pursuit. From outside, she warned Arthea to run because defendant was armed and coming to get her. Defendant entered Shawnee's downstairs apartment and began chastising Arthea. He then shot her in the head. Then he walked outside and pointed the gun at Carmelita. Carmelita pleaded with him to no avail; he shot her several times. Although permanently blinded, Carmelita survived.

Meanwhile, Melody and James ran into Shawnee's kitchen, hoping to escape through the back door. The door was jammed and would not open. Shawnee, while attempting to collect her children, began pleading with defendant. Defendant shot her in the head. Next, defendant turned and pointed the gun at Melody. She fell to the floor. Defendant pointed the gun at James and said, "[Y]ou next." James grabbed the gun, and he began wrestling with defendant. During this time, James heard the gun "click." Defendant broke free and struck James with the gun. Defendant fled, and James attempted to follow. Melody escaped while James struggled with defendant and ran to a neighbor's house to call the police. An officer with the University City Police Department arrested defendant at his home. Both Arthea Sanders and Shawnee Murphy died as a result of their wounds.

At trial, a firearms examiner employed by the St. Louis County Police Department Crime Laboratory testified that he analyzed six spent shell casings and five recovered rounds from the crime scene and from the body of Shawnee Murphy. From his study of the casings and recovered bullets, the examiner concluded that they were most likely .380 caliber bullets fired by a Davis pistol. Furthermore, he explained, this weapon would hold six rounds if one was loaded into the chamber and the magazine was full. He further testified that when empty, pulling the trig-

ger causes the gun to make a clicking sound.

Defendant testified in his own defense. He said that when he retrieved the gun from his car, he "just snapped." He stated that he did not intend to hurt anyone. Defendant also testified that he did not even remember shooting either Shawnee or Carmelita. In addition, defendant maintained that his memory also failed him when trying to recall his fight with James Johnson.

The jury found defendant guilty on all counts. During the penalty phase, the jury recommended he be sentenced to death for the murders of Arthea Sanders and Shawnee Murphy. To sustain a sentence of death, the jury found that the murder of Shawnee Murphy was committed while defendant was engaged in the unlawful commission of another unlawful homicide, that of Arthea Sanders and vice-versa.

### I.

Defendant argues that the trial court improperly sustained the state's motion to strike a venireperson for cause due to her views on capital punishment. He contends this deprived him of his rights to an impartial jury, due process, and freedom from cruel and unusual punishment under both the United States and Missouri Constitutions. The standard for reviewing the exclusion of a venireperson during the death-qualification phase of jury voir dire is whether the venireperson's views would prevent or substantially impair the performance of the duty as a juror in accordance with the instructions and the oath. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *State v. Barnett,* 980 S.W.2d 297, 303 (Mo. banc 1998), *cert. denied,* —— U.S.——, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999). This Court will not disturb the trial court's ruling on the qualification of a juror unless it is clearly against the evidence and is a clear abuse of discretion. *Barnett,* 980 S.W.2d at 303.

In this case, defendant argues the trial court abused its discretion because venireperson Stokes' initial reluctance to consider the death penalty was somehow eliminated or overshadowed by her willingness to follow the court's instructions and to follow the law. When the prosecution asked Stokes whether she could consider both life without parole and the death penalty, she replied, "That's tough." The record further reveals:

[PROSECUTION]: It's not supposed to be an easy decision.

STOKES: I probably would have to say no.

\* \* \*

STOKES: No. No. I'm a nurse. I been [sic] a nurse for 35 years. It would be extremely difficult for me under any circumstance cause [sic] I spent my life taking care of people. To say that I could impose the death penalty, I just don't think I could.

\* \* \*

Defendant, however, claims Stokes' later responses indicate a willingness to impose the death penalty.

[DEFENSE COUNSEL]: Nothing. All that you have to do is to be able to give meaningful consideration to that and life without parole. Can you give meaningful consideration and follow the [c]ourt's instructions?

STOKES: I believe I could.

[DEFENSE COUNSEL]: All right. And you can follow the law in the case, is that correct?

STOKES: Um-hum.

\* \* \*

[DEFENSE COUNSEL]: All right. And then finally, in my death penalty case there will be – well, let me put it this way: if on Saturday morning as Ms. Constantin's saying, she believes she's going to be up here asking for the death penalty. Is there anyone that feels just because we've gotten that far that the imposition of the death penalty must then follow? Another way, Ms. Brown,

if we get to the second stage you don't believe that automatically is the death penalty?

BROWN: I would consider both.

DEFENSE COUNSEL: And Ms. Stokes, you would consider both?

STOKES: Yes.

The most that may be said of Stokes' voir dire is that she would "consider" the death penalty along with life imprisonment, and also she was not compelled to give the death penalty. Those answers fall short of recanting her earlier direct statement that "I just don't think I could" impose the death penalty. When the state moved to strike Stokes for cause, the transcript read as follows:

> PROSECUTION: I would just state that she is one of those people caught up in the "I can follow the law" without really understanding what we're saying by "the law," and then when you actually ask her if she can consider the death penalty she can't consider the death penalty.
>
> DEFENSE COUNSEL: Judge, I think it was the other way around. When asked what your personal opinion is you can get almost anyone to say I'm for or against the death penalty, but the ultimate question is whether they can set that aside and then follow the law.
>
> THE COURT: It is, but, you know, at the very beginning she made a point about being a nurse and that she felt she couldn't. I felt that she was very strong on that, so I'm going to strike her for cause.

■ The applicable standard does not require that a juror's bias be proven with "unmistakable clarity." *Witt*, 469 U.S. at 424, 105 S.Ct. 844. It is sufficient that the record reflects evidence that the prospective juror's ability to impose the death penalty is substantially impaired. *Id.* Thus, the record does not reflect an abuse of discretion by the trial court on this issue. The claim is denied.

II.

■ Defendant claims the trial court failed to make sufficient fact findings regarding the nature of his confession to police. Specifically, he states the trial court should have made findings about whether his statements were made knowingly, intelligently, and voluntarily. Defendant did not question the trial court's failure to make findings in his motion for a new trial. In order to preserve an issue for appeal, it must also be presented in the motion for new trial. Rule 29.11(d). Since defendant did not preserve the issue, review is limited to a plain error standard. Rule 30.20. In its order overruling defendant's motion to suppress the statements, the court stated, "Cause called. Evidence adduced. Defendant's motions to suppress evidence, identification and statements are heard and over-ruled." While this Court has insisted upon the requirement that the record be clear that the trial court did make such findings regarding a defendant's statement, it has refused to make this a formal requirement. *State v. Knese*, 985 S.W.2d 759, 767 (Mo. banc 1999, *cert. denied*, —— U.S. ——, 119 S.Ct. 1814, 143 L.Ed.2d 1017 (1999)). The only prerequisite is that the trial court's conclusions make unmistakably clear that the confession is voluntary. *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). Moreover, the sufficiency of the court's findings need not be determined solely from the dispositive order. The whole record may be considered. *State v. Hull*, 595 S.W.2d 49, 53 (Mo.App.1980).

Defendant relies on *State v. Bittick*, 806 S.W.2d 652 (Mo. banc 1991), to argue the lack of specific findings warrants at the least a remand to determine the knowing, intelligent, and voluntary nature of any waiver on, in the alternative, a new trial. In *Bittick*, the Court remanded for a determination of whether the defendant's confession was knowing and intelligent. Bittick claimed that intoxication, lack of education, and delirium tremens diminished his ability to give a constitutionally

valid waiver of his rights. In this context, the trial court found only that Bittick's statement was "freely and voluntarily given." Based on the record and the incomplete ruling made by the trial judge, it was unclear whether the trial judge believed the waiver was "knowing and intelligent."

■ In the case at bar, the arresting officer *Mirandized* defendant who then indicated that he understood his rights. The officer then asked him what he had done with the gun. Defendant replied that he had thrown it in a creek. After being processed at the police department, another officer again *Mirandized* defendant. Again, defendant acknowledged his understanding of his rights. Furthermore, the officer had defendant initial each point on the *Miranda* form as they proceeded through it, had him sign it, witnessed it with another officer, and defendant circled "yes" under the question "do you wish at this time to talk or give a statement." Defendant does not suggest that intoxication or mental incapacity inhibited the validity of his confession. Defendant points out that the officer failed to videotape or audiotape his confession and did not obtain a signed written waiver. While no tape audio or video was made, a more careful reading of the motion hearing transcript refutes the latter. Additionally, he notes, this particular officer had never before conducted a murder interrogation, as if somehow this calls for additional safeguards to ensure a knowing, intelligent, and voluntary waiver. This is not the case. There is no requirement that an officer receiving a waiver of *Miranda* rights have prior experience in homicide investigation. If one is informed of the right to remain silent under *Miranda,* understands the right to remain silent under *Miranda,* and thereafter makes voluntary statements, it is absurd to say that such person has not made a knowing and intelligent waiver of his right to remain silent. *Schnick,* 819 S.W.2d at 336. Clearly, the record reflects the constitutional validity of defendant's waiver. Unlike *Bittick,* noth-

ing in the record suggests a coerced or uninformed waiver or that the trial judge did not believe the waiver was knowing, intelligent and voluntary. The trial court's failure to specifically announce its findings in more detail constitutes no more than harmless error. No plain error exists on this issue.

### III.

■ Defendant next challenges the adequacy of the jury instructions. First, he believes the trial court should have submitted instructions on the lesser included offense of voluntary manslaughter for the two homicide counts. In failing to do so, he maintains, his due process rights and right to be free from cruel and unusual punishment were violated. Rule 30.06(e) requires that the refused instruction be set forth in the argument portion of the brief. It has not been. Instead, defendant states that a certified copy of an affidavit from the St. Louis County Circuit Court legal counsel was filed with this Court indicating that a search for Instructions A and B was conducted. In his brief, defendant reproduces MAI–Cr3d 313.08. The state suggests that no such instructions were even submitted to the trial court. During the jury instructions conference the record reveals:

> [DEFENSE COUNSEL]: ... It's my understanding that the [C]ourt will mark as refused Instruction A, the [V]oluntary manslaughter that applies to [C]ount 1, and will mark as refused Instruction B the [V]oluntary manslaughter instruction as to [C]ount 3. And I will, for the record, make sure that the [C]ourt has a hard copy of that at some time as soon as possible.
>
> * * *
>
> THE COURT: And I was going to ask you that, but I wanted to make sure of the written copy, because technically you are supposed to have the written copy, and you will submit it to me before the case is completed, correct? Well, let

me ask it to you, can you submit it to me later on this week?

[DEFENSE COUNSEL]: Hopefully I can submit it to you as soon as we're done with the closing argument.

THE COURT: That's fine. That's what I mean. That's fine. . . .

Assuming *arguendo* that these two instructions were submitted to the circuit court and refused, the trial court's refusal may be reviewed where the rejected instructions were pattern instructions. *State v. Hopson,* 891 S.W.2d 851, 852 (Mo. App.1995).

█ To support his point of error, defendant offers the fact that he was angry about being misled about Carmelita's whereabouts and discovering her relationship with Tony Reynolds. He contends this anger was exacerbated by Arthea slashing the tires on his car. This, he submits, provides the evidence of sudden passion sufficient to require a voluntary manslaughter instruction. A voluntary manslaughter instruction is authorized where the circumstances would constitute murder in the second degree except the accused caused the death under a sudden passion arising from adequate cause. Sec. 565.023.1.[1] "Adequate cause" means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self control. *State v. Redmond,* 937 S.W.2d 205, 208 (Mo. banc 1996). It is doubtful that a person of ordinary temperament would be enraged to the point of killing two people and shooting a third multiple times under the facts here so as to entitle defendant to the voluntary manslaughter instruction. Regardless, the jury received an instruction on conventional second degree murder that offered the jury an option to find defendant guilty if it believed that all the elements of first degree murder had not been met. Since the jury convicted defendant of first degree murder on both homi-

cide counts, as opposed to second degree murder, no reasonable basis exists to contend the jury would have found differently had voluntary manslaughter instructions been submitted. *Barnett,* 980 S.W.2d at 305–306 (Mo. banc 1998). The Court declines defendant's suggestion that *State v. Smith,* 781 S.W.2d 761 (Mo. banc 1989), *rev'd. on other grounds,* 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306 (1990), which stands for the same point as the language cited from *Barnett, supra,* be reconsidered. The reasoning of both cases is sound.

█ Next, defendant challenges the trial court's refusal to submit his Instruction C listing statutory and non-statutory mitigating circumstances. Failure to submit Instruction C, he argues, limited the jury's consideration of circumstances that call for a more lenient sentence. This issue has not been properly preserved for appeal as it was not included in defendant's motion for a new trial. Rule 29.11(d). Nevertheless, he seeks plain error review pursuant to Rule 30.20. The claim that a trial court's rejection of a jury instruction including both statutory and non-statutory mitigating factors fails constitutional scrutiny has been repeatedly rejected by this Court. *State v. Rousan,* 961 S.W.2d 831, 849 (Mo. banc 1998), *cert. denied,* —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998); *State v. Copeland,* 928 S.W.2d 828, 853 (Mo. banc 1996). There is no plain error in this regard.

### IV.

█ Defendant asserts trial court error in failing to sever the first degree murder charges from the assault and armed criminal action charges *sua sponte.* Defense counsel neither moved the court to sever the charges nor addressed the issue in the motion for a new trial. This claim has not been preserved. Again, defendant requests plain error review. In his view, section 565.004.1 prevents the

---

1.  All references to statutes are to RSMO 1994,  unless otherwise specified.

joinder of any other offense alongside a first degree murder charge. However, the relevant sentence reads, *"Except as provided in subsections 2, 3, and 4 of this section,* no murder in the first degree offense may be tried together with any offense other than murder in the first degree." *Id.* (emphasis added).

Subsection 3 provides:

When a defendant has been charged and proven before trial to be a prior offender pursuant to chapter 558 RSMo, so that the judge shall assess punishment and not a jury for an offense other than murder in the first degree, that offense may be tried and submitted to the trier together with any murder in the first degree charge with which it is lawfully joined.

*Id.* Defendant qualifies as a prior offender under section 558.016.2 for having previously pleaded guilty to the offense of felony receipt of stolen property.

■■■ Additionally, defendant claims that the murder charges are not properly joined with the others under section 545.140.2. He asserts that no evidence of a common plan or scheme exists. Rule 23.05 governs joinder of offenses. Like section 545.140, Rule 23.05 permits the joinder of offenses that are "part of the same transaction ... or that constitute parts of a common scheme or plan." *Id.* On this point, defendant cites *State v. Simmons,* 815 S.W.2d 426 (Mo. banc 1991), as a case where this court reversed two convictions of capital murder as being improperly joined because they were not part of a common scheme or plan. *Simmons* involved two murders over a month apart. To connect the two crimes for joinder, the state argued that the defendant stole jewelry from both victims and pawned them at the same pawn shop on different occasions. Moreover, the state asserted that the case was one of circumstantial evidence, and this similarity went to demonstrate the

identity of the criminal. *Id.* at 429. While it remains unclear which of these two arguments convinced the trial court in *Simmons* that joinder was proper, neither basis was adequate to support joinder under section 565.004.1. First, the presence of facts common to both murders did not indicate that the defendant set out to kill both victims prior to killing the first. The second argument offers a basis for the admission of evidence, not joinder. *Id. Simmons* is not on point.

Here, in a matter of minutes, defendant went to his car, retrieved a pistol, shot three women, ran out of bullets, tried to fire on another person, and fought with him over a gun all in the same apartment. This satisfied the "same transaction or common scheme or plan" requirement necessary for joinder of criminal offenses. In this regard, there is no error, plain or otherwise.

## V.

■■■ Next, defendant challenges the trial court's decision to sustain the state's objection to the use of a police report to cross-examine officer Crowley. The report prepared by Crowley apparently included a statement by James Johnson to Sgt. Minaeff indicating that Johnson chased defendant following the murders.[2] Johnson testified at trial that he did no such thing. Since Johnson was a key witness for the state, defendant argues, the statement made to one officer, included in a police report prepared by another, should have been permissible to use while cross-examining the preparing officer to impeach Johnson. According to defendant, the trial court's refusal to allow this questioning violated his due process and confrontation rights as well as his right to be free from cruel and unusual punishment.

---

**2.** Defendant made no offer of proof of the content of Crowley's report. Defendant also did not call Sgt. Minaeff as a witness. Thus, the exact contents of what was in the report or what Minaeff claims he was told by Johnson is uncertain.

At trial, defense counsel insisted the reason for admitting this evidence was to explain subsequent conduct by police investigating the crime. The state objected. The court sustained the objection, concluding that Crowley's statement about what Sgt. Minaeff said Johnson told Minaeff was hearsay. Now, on appeal, defendant contends the evidence was intended to impeach Johnson. His brief does not address subsequent police conduct. When the trial court rules properly on admissibility of evidence at the time, a claim of error on another ground advanced for the first time on appeal will not be considered. *State v. Spica,* 389 S.W.2d 35, 54 (Mo.1965). The defendant is bound by the arguments made and the issues raised at trial and may not raise new and totally different arguments on appeal. *State v. Ward,* 782 S.W.2d 725, 731 (Mo.App.1989). Therefore, counsel failed to preserve this point. Defendant still fails to show how statements made by Johnson to an officer other than Crowley would not be hearsay when reported by Crowley.

Defendant cites *State v. Claypool,* 763 S.W.2d 313, 316 (Mo.App.1988), for the proposition that police reports may be admitted as evidence to impeach a witness with prior inconsistent statements. However, the police report at issue in *Claypool* was the report of an officer of what he was told by the witness whose testimony was being impeached. Unless it is clear that officer Crowley was present when Johnson made the allegedly contradictory statement, *Claypool* is inapposite. Trial courts retain broad discretion over the admissibility of evidence, and appellate courts will not interfere with those decisions unless there is a clear showing of abuse of discretion. *State v. Hutchison,* 957 S.W.2d 757, 763 (Mo. banc 1997). This point is denied.

## VI.

During the penalty phase, defendant claims the trial court plainly erred in permitting Carmelita to testify as to two incidents for which he was never charged.

This point is absent from the motion for new trial and is therefore unpreserved for appeal. The trial court overruled defense counsel's objection to Carmelita testifying about one incident in which defendant struck her, resulting in a black eye, and another event in which he threatened her with a gun. This is plain error, he believes, because the state did not have to prove these unadjudicated "bad acts" beyond a reasonable doubt. In support, he cites cases from Indiana and Alabama. *See State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276 (1979); and *Cook v. State,* 369 So.2d 1251 (Ala.1978). However, our precedent is quite clear. As a general rule, the trial court "has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *State v. Kinder,* 942 S.W.2d 313, 331 (Mo. banc 1996) (quoting *State v. Six,* 805 S.W.2d 159, 166 (Mo. banc 1991)). Furthermore, evidence of a defendant's prior unadjudicated criminal conduct may be heard by the jury in the punishment phase of a trial. *Id.* Because *Kinder* was and remains a correct statement of Missouri law, defendant's request that it be reconsidered is declined.

## VII.

Defendant complains that the trial court erred in permitting the state to argue during the penalty phase that he would have killed Shawnee's children had he not run out of bullets. Counsel, however, failed to object at trial and did not raise the issue in the motion for a new trial. This point is not preserved for appeal. Review is limited to plain error. Rule 30.20. By suggesting defendant would have shot Shawnee's children, he submits the state played upon the emotions of the jury, obtaining a sentence not based on reason as required by law. *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). Plain error will seldom be found in unobjected to closing argument. *State v. Kempker,* 824 S.W.2d 909, 911 (Mo. banc 1992). A hold-

ing that would require the judge to interrupt counsel presents a myriad of problems. *Id.* To be entitled to relief under the plain error rule, an appellant must go beyond a mere showing of demonstrable prejudice to show manifest prejudice affecting his substantial rights. *State v. Parker*, 856 S.W.2d 331, 332 (Mo. banc 1993). In other words, the appellant must show that the error affected his rights so substantially that a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* at 332–33.

Even if the comment was improper, a conviction will be reversed for improper argument only if it is established that the comment in question had a decisive effect on the jury's determination. *Id.* at 333. When reviewing an argument for plain error, the burden is on the defendant to prove the decisive significance. *Id.* The record does not suggest evidence that the state's single comment during the penalty phase closing argument had such decisive effect. The jury convicted defendant of the first degree murder of two women. The evidence offered at trial indicated that he entered the apartment with a loaded semi-automatic handgun. He proceeded to shoot three people. Two died. One was permanently blinded. He tried to fire on at least one other, but had spent all six rounds the weapon was capable of carrying. The statutory aggravator was satisfied as the jury found that he committed each murder while engaged in the commission of the other. No doubt existed that everyone in the apartment was put at risk by defendant's shooting spree, including the children. It is fair to infer that the only reason others in the house were not shot was that defendant ran out of bullets. How the isolated comment regarding his intentions toward the children effected the jury's verdict is highly speculative, at best. There is no plain error here.

## VIII.

Lastly, defendant attacks the sentence of death on a number of fronts.

First, he argues the sentence is excessive and disproportionate and, therefore, violative of his rights to due process and to be free from cruel and unusual punishment. He claims the trial court erred in imposing the sentence and, pursuant to this Court's statutory review under section 565.035, he requests that the sentence be vacated. Second, he suggests his sentences are the product of passion and prejudice arising from the state's repeated references to the murders as "cold-blooded." Finally, he disputes the adequacy of this Court's proportionality review. He contends this Court fails to consider all similar cases, does not maintain a complete database as required by statute, and that there is a lack of notice of the proper procedure followed by a meaningful opportunity to be heard. He claims these last three errors resulted in the arbitrary and capricious imposition of the death penalty and calls for the setting aside of the death sentences.

Defendant argues that the circumstances surrounding the murders evince a conflict of intense emotion and jealousy, making a more lenient sentence appropriate. According to him, the death sentence is excessive and disproportionate in light of the domestic context from which the murders arose. To support this statement, he cites Florida cases and three Missouri Court of Appeals decisions involving murder in domestic violence situations where the death penalty was not imposed. The issue, however, in proportionality review is not whether any similar case can be found in which the jury imposed a life sentence. Rather, the issue is whether the death sentence is excessive or disproportionate in light of "similar cases" as a whole, considering the crime, the strength of the evidence, and the defendant. Section 565.035.3(3). A sentence of death has often been imposed where the defendant, as here, murdered more than one person. *State v. Johnson*, 968 S.W.2d 123, 135 (Mo. banc 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998); *State v.*

*Clemons,* 946 S.W.2d 206, 233 (Mo. banc 1997), *cert. denied,* 522 U.S. 968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997). Moreover, a defendant's willingness to kill, and kill again, is compelling and clear of conduct meriting even greater societal concern than individual homicide. Such conduct particularly warrants imposition of the ultimate punishment. *State v. Rodden,* 728 S.W.2d 212, 222 (Mo. banc 1987). In his view, the murders occurred in the context of defendant finding out about Carmelita dating Tony Reynolds. The record reflects a different crime. While he did shoot Carmelita multiple times, defendant also murdered two other women having nothing to do with any relationship he continued to have with Carmelita beyond being in the same apartment. Shawnee pled for her life before he killed her as her children sat in the next room. He ran out of bullets and still tried to shoot James Johnson, a fourth person merely present in the apartment, who heard the unloaded gun click as defendant dry-fired it. Considering the statutory factors, capital punishment is not excessive or disproportionate in the case at bar.

▄▄ Defendant also claims the sentence imposed resulted from passion and prejudice manufactured by the state's repeated references to the murders as "cold-blooded." This is merely a transparent effort to resurrect an unpreserved objection that the argument was improper. Such statements are not necessarily improper if they ·result from a reasonable inference from the evidence. *See State v. Debler,* 856 S.W.2d 641, 651 (Mo. banc 1993); *State v. Basile,* 942 S.W.2d 342, 353 (Mo. banc 1997), *cert. denied,* 522 U.S. 883, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997). Referring to the murder of two women not involved in any dispute defendant had with his ex-girlfriend, while one pled for her life as her children were in the next room, as being "cold-blooded" is a reasonable inference from the evidence.

After a careful review of the record, nothing indicates that the trial court's imposition of the death sentence resulted from the influence of passion, prejudice, or any other arbitrary factor. See section 565.035.3. The jury found one statutory aggravator in the murder of Arthea Sanders: that the murder was committed while defendant was engaged in the commission of another unlawful homicide. Likewise, it found one statutory aggravator in the murder of Shawnee Murphy: that the murder was committed while defendant was engaged in the commission of another unlawful homicide. The jury's finding of these aggravaters is adequately supported by the evidence and was surely the reason for the death sentence, not the state's characterization of the murders.

▄▄ Defendant also challenges the adequacy of the proportionality review database, and claims he had a lack of proper notice. These points are without merit. The purpose of the proportionality review is merely to prevent freakish and wanton applications of the death penalty. *Johnson,* 968 S.W.2d at 134. The review performed sufficiently meets that standard. *Id.* Additionally, claims contesting the adequacy of the database have also been dismissed. *Id.* at 135. Finally, due process claims similar to defendant's have been rejected by this Court. See *id.*

## CONCLUSION

Having determined that none of Mr. Winfield's claims on appeal have merit, the judgment is affirmed.

All concur.