**STATE of Missouri, Respondent,**

v.

**Joshua Joe WYBLE, Appellant.**

**No. WD 65139.**

Missouri Court of Appeals,
Western District.

Jan. 9, 2007.

Kent Denzel, Asst. State Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Attorney General, Jefferson City, MO, for respondent.

Before THOMAS H. NEWTON, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Joshua Wyble appeals his conviction for first-degree statutory sodomy, section 566.062.[1] No grounds for appeal were preserved because the appellant failed to file a motion for new trial. Nevertheless, Wyble contends that the trial court plainly erred in allowing testimony under section 491.075 RSMo, because there was insufficient evidence to show that the young victim was unavailable to testify. Wyble asserts that admission of the resulting testimony at trial plainly violated his Sixth Amendment confrontation rights under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because we find no plain, obvious error in the rulings of the trial court suggesting the possibility of a manifest injustice or miscarriage of justice, we affirm the judgment of the trial court.

## Procedural and Factual Background

In April 2003, Wyble lived with Glenda W. and Tim B. (Glenda's boyfriend), and Glenda's three-year-old daughter, the child. Wyble had previously lived with them from the end of 2002 through March 2003, when he went to Texas for a brief period after getting kicked out of the house by Tim for failing to help pay the bills. He returned to Chillicothe to live with them in April 2003, stating he had "straightened up" and had a job.

On April 24, 2003, Glenda and Tim were preparing for a trip to Springfield and needed to make a trip to the store. Glenda's daughter, the child, did not want to go to the store, so Wyble volunteered to watch her. Glenda and Tim were gone about an hour. When they returned, the child was asleep, which was unusual because she had quit taking naps. Wyble was anxious to leave even though Glenda and Tim had expected him to stay at their house while they were gone. Glenda and Tim agreed to take Wyble to his mother's house in Brookfield on their way to Springfield.

Soon after returning from the store, they loaded the car for Springfield. The child was still asleep when they put her in her car seat, which was next to where Wyble was sitting. On the way to Brookfield, the child woke up. She started screaming that she wanted to be with Glenda and not in the backseat, which was unusual. Then Wyble leaned over to say something to the child, and touched her. The child "just went crazy" and started screaming.

After dropping Wyble off in Brookfield, Glenda, Tim, and the child continued to Springfield for the weekend. Over the weekend, the child was crabby and not herself. She did not want to sleep anywhere but with Glenda, which was unusual. She was also digging at her private area. Glenda noticed this and examined her daughter. She observed the area to be very red with a bad odor.

Glenda tried to apply some over-the-counter ointment she had gotten for her daughter's yeast infection a couple months prior even though the symptoms differed greatly. The child fought and screamed

---

1. Statutory references are to the Revised Statutes of Missouri, 2000, unless otherwise indicated.

each time Glenda touched her. The medicine did not help.

After returning from Springfield, the child continued to not act like herself. She did not want to sleep in her own bed. She continued to dig at herself, and Glenda still noticed irritation. Also, the child awoke a few times during the night crying and screaming, and she was calmer away from the house.

A couple days after returning from Springfield, the child stayed with her grandmother, Sharon W. The child made various comments while at Sharon's house regarding her "butt" (which she used to describe her vaginal area) being red, and stated that Wyble had made it red. Sharon later examined her granddaughter and noticed the same red irritation and bad odor Glenda first noticed in Springfield. After Glenda picked up the child later that evening, the child told Glenda that Wyble had put his finger "in her hole." The child made other comments the next few days and, while bathing, would not let Glenda wash her private areas.

A few days later, Glenda took the child to the hospital for an examination because the redness, irritation, and odor persisted. Dr. Campbell and Cindy Sackrey, a nurse, saw the child at the hospital. At trial, Ms. Sackrey described the foul odor as associated with sexual activity or a sexually transmitted disease. The child's vaginal opening was six to twelve times larger than most children her age. During the examination the child repeatedly made comments that she did not want anyone to touch her "butt" or put anything in her "hole." The child tested positive for strep B, which she could only have gotten from someone carrying strep B. Neither Glenda nor Tim nor Sharon had strep B.

The child was given medication to treat strep B. A couple days later, after the child had a negative reaction to the medication, Glenda took her back to the hospital for a shot. When Ms. Sackrey administered the shot, the child again screamed that she did not want anyone to touch her "butt."

Wyble was charged by information with one count of statutory sodomy in the first degree, section 566.062. After a change in venue, the court conducted a section 491.075 hearing to determine the admissibility of statements made by the child to her family, medical personnel, and a social worker. Pursuant to section 491.075.1(2)(c), the court found the statements admissible. The court ruled that the emotional and psychological trauma that could result from having the child testify made her unavailable as a witness, and that the statements had sufficient indicia of reliability to be admitted.

At trial, the child's mother and grandmother testified concerning the child's statements accusing Wyble. Cindy Sackrey, the E.R. nurse who examined the child, testified concerning statements made by the child to the effect that the child did not want anyone to touch her private area. A social worker testified that she had two interviews with the child to try to determine how to help her. The social worker denied having a forensic purpose or a law enforcement purpose in conducting the interviews, but admitted seeking to determine whether abuse had taken place. She testified that when she showed the child some dolls and referred to the male doll as "Josh," the child stated that Josh was "a bad boy, was in trouble, and hurt." Defense counsel objected to the admission of all of this evidence on the grounds that it violated Wyble's right to confront and to cross-examine the witness. The objection was overruled.

Wyble presented no evidence in his defense. The jury found him guilty of first-

degree statutory sodomy. He waived jury sentencing. The trial court sentenced him to thirty years of confinement. This appeal follows.

## Standard of Review

 At trial, Wyble's trial counsel was apparently allowed a continuing objection to the testimony of the child's out-of-court statements on the ground of rights guaranteed by the Confrontation Clause of the U.S. Constitution. However, counsel failed to raise this issue in a motion for new trial. For that reason, the issues are not properly preserved. Supreme Court Rule 29.11(d); *State v. Winfield*, 5 S.W.3d 505, 511 (Mo. banc 1999); Supreme Court Rule 30.20. In order to prevail on an unpreserved claim of error, the appellant must demonstrate that plain and obvious error was committed by the trial court and that either manifest injustice or a miscarriage of justice would occur if the error were not corrected. *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997).

## Analysis

Appellant assigns six points of error to the trial court's actions. The first five deal entirely with the admission of out-of-court statements made by the alleged child victim, and argue that they should not have been admitted because, under *Crawford*, the admission of the statements violated the defendant's right to confront the witnesses against him. The sixth point of error claims that the trial court erred in its determination that the child was unavailable due to the potential for trauma under section 491.075. We will consider the sixth point and then the others together.

Section 491.075 states, in relevant part:

1. A statement made by a child under the age of fourteen relating to an offense under chapter 565, 566 or 568, RSMo, performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

> (1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

. . . .

> (2)(c) The child is otherwise physically available as a witness but the court finds that the significant emotional or psychological trauma which would result from testifying in the personal presence of the defendant makes the child unavailable as a witness at the time of the criminal proceeding.

 Under this statute, before the out-of-court statements can be admitted, the trial court must find sufficient "indicia of reliability" in the statements, and must find that the child would suffer "significant emotional or psychological trauma" if forced to testify "in the personal presence of the defendant."

 We first consider Wyble's point contesting the unavailability of the child as a witness for trial. In determining whether the child should testify, the trial court must find that the child would be traumatized "not by the courtroom generally, but by the presence of the defendant." *State v. Naucke*, 829 S.W.2d 445, 448 (Mo. banc 1992). This trauma must be "more than *de minimis*" which means "more than 'mere nervousness or excitement or some reluctance to testify.'" *Id.* Here, there was substantial evidence that the child had much more than a *de minimis* emotional reaction to the items alleged and to the defendant personally.

There must be expert testimony about the potential for trauma unless "the distress of the child victim is so evident that the trial court would be competent to determine the issue itself." *State v. Sanders*, 126 S.W.3d 5, 15 (Mo.App.2003). The court cannot rely strictly on the age of the child. Here, there is no indication the court relied strictly on the age of the alleged victim in making the determination. This case is not like *Kierst v. D.D.H.*, 965 S.W.2d 932 (Mo.App.1998) (court relied solely on the child's age and the court's visual observation of the child), or *State v. Sanchez*, 752 S.W.2d 319 (Mo. banc 1988) (court assumed emotional trauma solely because of age). In this case, the trial court heard testimony from the victim's mother as to her belief that the child would be traumatized. A social worker also opined that it would be traumatic, although the social worker seemed to be relying primarily on age. The court also was aware of the emotional displays of the child observed by the witnesses.

The child demonstrated extreme emotional reaction, and markedly changed behavior, after she was left alone with Wyble on April 24, 2003. Immediately after that incident, when the child awoke, she was frantic to get away from Wyble and to cling to her mother. The child had nightmares, wet the bed, had trouble sleeping away from her mother, and cried if anyone mentioned the name "Josh." After they moved from the house where the alleged incident occurred, the child became fearful and clung to her mother when they drove past the old house. These incidents are clearly factors other than age upon which the trial court could have based its decision. Even if the social worker's recommendation seemed to be based mostly on age because the social worker did not articulate other reasons, there was sufficient other evidence that we can affirm that there is no demonstration of plain or obvious error in the determination of potential trauma.

■ Appellant also contends that his rights to a fair trial were violated when statements made by the child were allowed in through the testimony of her mother, grandmother, nurse, and social worker. Appellant acknowledges that the Supreme Court of Missouri held section 491.075 constitutional in *State v. Wright*, 751 S.W.2d 48 (Mo. banc 1988), but contends that the United States Supreme Court's analysis in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), would at least affect the application of the statute.

Although Wyble's claims have not been preserved, we will cursorily consider the facts of this case in the light of Rule 30.20 to see if there is plain, obvious legal error indicating a potential manifest injustice or miscarriage of justice.

In *State v. Justus*, 205 S.W.3d 872, 880 (Mo. banc 2006), the Missouri Supreme Court applied *Crawford* in the context of child hearsay statements admitted under section 491.075. The defendant in *Justus* did not challenge the constitutionality of section 491.075. *Id.* at 878. Similarly, the defendant in this case does not directly challenge section 491.075; he seeks only to have the court declare a *Crawford* exception applicable to the hearsay statements in this case. The Supreme Court did just that in *Justus*. *Id.* at 879–81.

Under *Crawford*, out-of-court *testimonial* statements by witnesses are barred under the Confrontation Clause unless the witnesses are unavailable and the defendants had prior opportunity to cross-examine the witnesses. *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354. Although the Court in *Crawford* explicitly left for "another day any effort to spell out a comprehensive definition of 'testimonial,'" *id.* at 68,

124 S.Ct. 1354, the Court did give some examples of statements that would be testimonial. These examples included prior testimony at a preliminary hearing, prior testimony before a grand jury, prior testimony at a former trial, and police interrogations. *Id.* "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354.

In *Justus*, the Court provided guidance on the application of *Crawford* to section 491.075. That case involved an alleged three-year-old victim, a girl, who turned four during the investigatory stage. *Justus*, 205 S.W.3d at 874–75, 880 n. 9. The accused was the child's father, with whom the child had visitation after the father's divorce from the mother. *Id.* at 875. The witnesses at trial included not only the child's mother and the child's grandmother, who both reported the child's statements, but also Cynthia Debey, a child abuse investigator for the Division of Family Services, and Joyce Estes, a social worker and counselor for a children's advocacy organization. *Id.* at 875–76. Defendant Justus was convicted based on the hearsay statements of the child. *Id.* at 877.

In *Justus*, where no general challenge to section 491.075 was made, the Court declined *sua sponte* to review the statute's constitutionality. Similarly, in this case, there is no such challenge. Also, here, unlike in *Justus*, no claims of error have been preserved.

In *Justus*, the defendant properly preserved a challenge to the admission of the testimony of Debey, the investigator, and Estes, the social worker, on the grounds of *Crawford. Id.* at 876. The Court determined that, in light of the facts, *Crawford* required the exclusion of the testimony of both Debey and Estes as to the hearsay

statements of the child. *Id.* at 880–81. The Court noted that out-of-court statements are testimonial, and hence governed by *Crawford,* when "the circumstances objectively indicate" that there is no "ongoing emergency," and "that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Justus,* 205 S.W.3d at 879 (*quoting Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006)).

The statements to Debey were made as part of a government investigation of child abuse as a result of a hotline call. *Id.* at 880. Also, Estes, the social worker, was acting as a government agent when she conducted a "forensic interview" of the child for law enforcement purposes. *Id.* The child in that case was also aware that her statements could be used to prosecute Mr. Justus. *Id.* The child's demeanor was calm, and the child was asked about past events for prosecution purposes. *Id.* at 880.

We briefly consider and compare the nature of the child's out-of-court statements in this case. The child's statements made to her mother and grandmother were given in an informal, unstructured setting, and were generally spontaneous. The child's statements in the emergency room, to the effect that she did not want anyone to touch her private areas, as reported by the nurse, were made in connection with the diagnosis and treatment of the redness and discomfort she was experiencing. They were related to the child's then present experience, not to past events. The child was not calm, but was distressed. While medical personnel are, of course, required to report indications of child abuse, there were no statements made by the child about past events. No steps were taken to identify a perpetrator,

and the child made no statements as to a perpetrator.

The social worker denied that her purpose was to conduct a forensic interview for investigation purposes or for proof purposes. She testified that her purpose was not to develop evidence for prosecution, but to create an environment in which the child would be comfortable talking about anything that happened for counseling and therapy purposes. She acknowledged she did want to determine whether abuse had taken place. The child attended two sessions. More were planned, but the mother did not return the child.

Of course, it goes without saying that the medical personnel and the social worker each would have been aware that testimony as to the child's hearsay statements could be sought by the State for prosecution purposes. Here, though, the witnesses, according to their own testimony, stated they were not driven by the purpose of prosecution. Nor is there obvious reason to believe that here the *child* would have thought prosecution was in view, at least as to the medical personnel.

■ While interviews such as the social worker interview in this case would generally be subject to careful scrutiny in the light of *Justus*, when properly challenged, here we need not undertake such a task. We need not decide whether there was plain, obvious error when it is clear that there could be no prejudice. There is no presumption of prejudice as to unpreserved error. *See State v. Isa,* 850 S.W.2d 876, 884 (Mo. banc 1993) (when the standard of review is for plain error, the defendant bears the burden of showing prejudice resulting in manifest injustice).

Our examination of the issue of any prejudice does not show the possibility of prejudice in view of the overwhelming evidence of Wyble's guilt. The statements made by the child to the mother and grandmother were punctuated with emotional reactions indicative that something traumatic and unusual had happened to the child in the short period of time the child was in the care of Wyble. The child was between the ages of three and four years old. There was no indication of any motive of the child, the mother, or the grandmother to fabricate such statements. The child's statements appear to have been absolutely genuine and relatively consistent. The emergency room nurse's testimony further supported the notion that the child was genuinely upset and fearful of being touched. The child contracted a sexually transmitted disease, which, according to the evidence, she could not have contracted from anyone in the household other than Wyble. This disease began to manifest itself within a few days after the child was left alone with Wyble. The physical examination of the child revealed factors consistent with sexual abuse.

In short, there was no doubt of the abuse of the child; no doubt that the child had an extreme emotional reaction to Wyble; and no doubt that something traumatic happened when the child was alone with Wyble. Nothing occurred at trial to impeach the strength of the State's evidence or to suggest an alternative theory of events.

The instance of prompting the child (that occurred when the social worker used two dolls and referred to one as "Josh") raises a question both as to the reliability of that statement and as to the purpose of the interview. But even though we may doubt that the one statement made to the social worker (that "Josh" was a "bad boy, was in trouble, and hurt") should have been admitted, there can be no reasonable basis to grant relief here. Again, there is no presumption of prejudice, and Wyble fails to persuade us that there could be

any possible prejudicial effect of the one statement in light of the overwhelming weight of the evidence of all the circumstances indicating guilt in this case.

## Conclusion

There is no basis for granting relief in this case. For all of the foregoing reasons, the judgment of the trial court is affirmed.

NEWTON, J., concurs.

ELLIS, J., concurs in separate opinion.

JOSEPH M. ELLIS, Judge, concurring opinion.

I concur in the result reached by the majority. Contrary to the majority position, however, I find the admission of the child's out-of-court statements to Cindy Sackrey and Barbara Oliver was open and obvious error. Nevertheless, I concur in the result because Wyble cannot demonstrate the requisite prejudice required under our standard for plain error review.

In *State v. Justus*, 205 S.W.3d 872 (Mo. banc 2006), the appellant was convicted of sexually abusing his three-year-old daughter based on the hearsay statements of the child. *Id.* at 874–75. At trial, the child's mother and grandmother, as well as a Division of Family Services (DFS) child abuse investigator, Cynthia Debey, and a social worker, Joyce Estes, that the child was referred to by DFS, testified as to the child's out-of-court statements. *Id.* at 875–77. Justus properly challenged and preserved the admission of the testimony of Debey and Estes on the basis of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Id.* at 878. The Missouri Supreme Court found that the child's statements to Debey and Estes were "testimonial" in the *Crawford* sense. *Id.* at 881. Because Justus had not been given a prior opportunity to cross-examine the child, the Court unanimously held that

it was error to admit the testimony of Debey and Estes as to the child's out-of-court statements. *Id.* at 880–81. This holding was based on the following facts: (a) the statements were not made in the middle of an emergency situation; (b) the statements detailed past events about what Justus had done; and (c) the statements were made in circumstances indicating that the primary purpose was to establish or prove past events. *Id.* at 880–81.

In the instant appeal, the child made out-of-court statements to the mother and grandmother, as well as Cindy Sackrey, an Emergency Room nurse at Hedrick Medical Center, and Barbara Oliver, a clinical social worker. I address only the testimony of Ms. Sackrey and Ms. Oliver about the statements made by the child to them.

In *Justus*, our Supreme Court made it clear that a significant distinction between testimonial and non-testimonial statements is whether they were made in circumstances where there was an on going emergency and they were necessary to secure assistance. *Id.* at 880. If so, they are to be treated as non-testimonial. On the other hand, if there is no emergency or immediate threat, and the statements are elicited in response to questions about what had happened, they are testimonial. Id. In evaluating the circumstances in *Justus*, the Court noted that the statements in that case were not made "in the midst of an 'on going emergency.'" *Id.* The child was not in any immediate danger, she was speaking about past events. Id. The statements to the DFS investigator, Debey, and the social worker, Estes, were made in a formal setting with a question-and-answer format. *Id.* at 880. Debey was acting as an investigator for DFS, and "[a]lthough Estes [was] not a government worker, she was acting as a government agent when she interviewed [the child], as the division

of family services made the referral to Estes...." *Id.*

Using this analysis, I would readily concede that statements made to an Emergency Room nurse would typically be non-testimonial, because they would be made in an emergency situation so as to permit medical staff to provide assistance. In this case, however, there was no emergency. Hedrick Medical Center is a government owned and funded institution in Chillicothe, Missouri. Cindy Sackrey works at Hedrick. She is the Emergency Room nurse who testified about the child victim's visits to the ER and the child's hearsay statements made during those visits. It is apparent from Sackrey's testimony that children with allegations of sexual abuse are routinely seen in the Hedrick Emergency Room. It is also clear from the record that a significant purpose of the question-and-answer session between the staff, the child, and the mother went beyond diagnosing and treating the child's condition.[1] The child was being seen at the Emergency Room days or even weeks after the abuse for non-life threatening physical conditions presumably related to the prior abuse. The child was being asked about past events, and Ms. Sackrey specifically testified that she and Dr. Campbell were "trying to document as thoroughly as possible."

In the case of Barbara Oliver, as in *Justus*, the Division of Family Services (DFS) referred the child to Ms. Oliver. She is a clinical social worker, who testified as to the child's statements to her. Ms. Oliver was to do an assessment, whereby she would see the child five to ten times. She actually saw the child on two occasions. There was no on-going emergency either time. The interviews occurred in the formal setting of her office. In advance of seeing the child, she received and reviewed a history of the allegations from DFS. She admitted seeking to determine whether abuse had taken place. She used the name "Josh" as a cue when interviewing the child, and the child was being asked about past events. When asked how many three-year-olds, or children close to that age, she had interviewed and assessed, she testified that it was probably "20, 25—20 to 50. I don't know. I've seen a lot of cases."

---

1. The following is a sampling of her testimony on direct examination by the prosecuting attorney:

 Q. Knowing the allegations that were being made about what had happened to [the child], what sort of an examination did you undertake of the child?
 A. We only do a preliminary one because we're not able to do the, quote, SAFE exam for anybody under the age of 13. So what the doctor did was assess her, and then we assessed her bottom, or perineal area, for any signs of tears or abrasions, or anything like that.
 * * *
 Q. In the course of that examination, are questions asked of the child?
 A. We ask them if anybody has touched their private areas and if they know the difference between good touch and bad touch.
 * * *
 Q. And when—after she said that, that her butt hurt, was any question asked of her seeking an explanation for that, or did you just proceed on with the examination?
 A. We try not to lead anybody. We just kind of asked them why her bottom would hurt, that type of thing.
 * * *
 Q. And what was the purpose of giving her an inoculation or shot?
 A. We prophylactically treat people for sexually transmitted diseases.
 The colloquy below is from the cross-examination by Ms. Dunn:
 Q. Now, did you actually take a note to that effect?
 A. No, I did not.
 Q. Okay. Is there a reason why you didn't?
 A. It was just kind of overwhelming, and I think that one just kind of slid by. **Dr. Campbell and I was trying to document as thoroughly as possible.** (Emphasis added).

It is apparent from the testimony of Ms. Sackrey and Ms. Oliver that they are both frequently involved with incidents where child sexual abuse is alleged. It is likewise apparent that they are carefully probing and documenting in anticipation of prosecution. It can be readily inferred based on their familiarity with the process that they know that they can be used in court as a conduit to provide testimony by the child against the accused without the child being confronted or cross-examined by the accused or his or her attorney.

Justice Scalia, speaking for the Court in *Crawford*, makes it quite clear that it is not just "[s]tatements taken by police officers in the course of interrogations" that are testimonial. *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364. "The involvement of government officers in the production of testimonial evidence presents the same risk [as police investigations]." *Id.*, 541 U.S. at 53, 124 S.Ct. at 1365. And in *Justus*, our Supreme Court expressly held that the testimony of the DFS investigator and the social worker to whom the child was referred by DFS was testimonial and should have been excluded. 205 S.W.3d at 880–81.

Indeed, in most child sexual abuse cases, after the child victim first spontaneously says something to an adult that causes suspicions of abuse, virtually nothing that child says thereafter to anyone about the alleged abuse, whether it be to parent, grandparent, doctor, nurse, or counselor is truly and completely non-testimonial in the *Crawford* sense. This is so because, once the allegations have surfaced, everyone is trying to elicit information from the child about the allegations. They may be doing so for very well-intentioned motives, such as to provide love and support, treatment, or counseling, but in doing so, they are trying to elicit information by re-directing conversation with the child, asking pointed

questions, using dolls, or any variety of other reliable or unreliable means of obtaining details and assessing the credibility of the allegations. Ultimately, the bottom line is almost always to find out what happened, when it happened, and who did it, based in equal parts on concern for the child and a desire to assess responsibility. Because of this and the susceptibility of young children to the power of suggestion, information provided by the child is inherently suspect. It is for that very reason that the Confrontation Clause is so critical to child abuse prosecutions because "[i]t commands ... that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370. So it is not surprising that the Missouri Supreme Court has acknowledged that *Crawford* "cast doubt on the validity of section 491.075, which permits a child victim's testimony to be used as substantive evidence in sexual misconduct cases even though the child has not been subjected to cross-examination." *In the Interest of R.B.*, 186 S.W.3d 255, 256 (Mo. banc 2006).

As noted at the outset, the error in this case was not preserved, and we review only for plain error. Wyble's trial counsel made and was allowed a continuing objection to the testimony repeating the out-of-court statements of the child on the basis of violation of his rights under the Confrontation Clause of the U.S. Constitution. But counsel failed to include the issue in the motion for new trial, and, as a consequence, it is not properly preserved. Therefore, although the child's statements to Ms. Sackrey and Ms. Oliver were testimonial and should have been excluded, as discussed *supra*, no prejudice is presumed because the error was not preserved. Thus, we are not limited, as the Court was in *Justus*, to upholding the verdict only if the error was " 'harmless beyond a reasonable doubt.' " 205 S.W.3d at 881 (quoting

*State v. Wolfe*, 13 S.W.3d 248, 263 (Mo. banc 2000)).

While the majority asserts otherwise, the remaining evidence consisting of the mother and grandmother's testimony was anything but overwhelming. Nevertheless, it was sufficient to permit the jury to render a guilty verdict. As a result, Wyble cannot conclusively demonstrate prejudice because the jury could have found the remaining evidence sufficient to convict him. Accordingly, we cannot say that the error resulted in a manifest injustice or miscarriage of justice. Thus, I concur in the result reached by the majority.[2]

2. The case presents the unique situation where we must affirm the conviction on this direct appeal, but it is almost certain that Wyble will be granted a new trial in the ensuing Rule 29.15 proceeding based on counsel's failure to preserve the error.