

# Missouri Court of Appeals

## Southern District

## Division Two

STATE OF MISSOURI, )
)
Respondent, )
)
vs. ) No. SD34231
) Filed: November 9, 2016
EUGENE CULPEPPER, JR., )
)
Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin R. Holden, Circuit Judge

### **<u>AFFIRMED</u>**

Eugene Culpepper, Jr. ("Culpepper"), appeals the judgment of the trial court following his convictions for the class B felony of first-degree assault, the unclassified felony of armed criminal action, and the class C felony of second-degree assault. Culpepper challenges the judgment of the trial court in twelve points on appeal. Finding no merit to any of Culpepper's points, we affirm the judgment of the trial court.

## Factual and Procedural Background

"Appellate review of sufficiency of the evidence is limited to whether the state has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015). This Court "does not reweigh the evidence but, rather, considers it in the light most favorable to the verdict and grants the state all reasonable inferences." *Id.* All evidence and inferences contrary to the verdict are disregarded. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). The following summary of the relevant facts is presented in accordance with these governing principles.

Jessica Duck ("Duck") and Jason Durgan ("Durgan") were in a long and contentious romantic relationship. On February 9, 2015, Duck and Durgan rented a motel room at the Battlefield Inn ("the motel") in Springfield. In the late evening of February 9, 2015, or early morning of February 10, 2015, Jackie Merryman ("Merryman")[1] and Culpepper arrived at the motel room. Thereafter, Culpepper and Durgan got into an argument. Culpepper threatened to shoot Durgan with a pistol, and when Duck tried to intervene, Culpepper shot her in the wrist. Culpepper then left the motel.

The police were called. When Officer Robert Douglas ("Officer Douglas"), of the Springfield Police Department, arrived at the motel room, Duck told him that Culpepper shot her.

The police found a gun lying in the grass between the pool and the fence of the motel. The police also found a bullet hole in the motel room wall and a shell casing on the motel room floor. Police found Culpepper's EBT[2] card on a table in the motel room.

---

[1] Merryman also goes by the last name of "Newberry."

[2] EBT is an electronic system that allows state welfare departments to issue benefits via a magnetically encoded payment card.

2

Culpepper was arrested on March 3, 2015, three weeks after the shooting, when a vehicle Culpepper was riding in was stopped for having a broken taillight. When the driver got out of the vehicle, Culpepper jumped into the driver's seat and drove away. Culpepper was apprehended after a brief chase, and officers found illegal drugs in the vehicle.

Culpepper was charged by amended information, as a persistent offender, with the class B felony of assault in the first degree (Count I), pursuant to section 565.050; the unclassified felony of armed criminal action (Count II), pursuant to section 571.015; and the class C felony of assault in the second degree (Count III), pursuant to section 565.060.[3]

Before trial, defense counsel told the trial court that he had an ethical dilemma if the State called Durgan as a witness. He indicated that he had not prepared for Durgan to be a witness, that Culpepper had refused to ask for a continuance, and that he might not be prepared to "effectively represent [Culpepper's] interests" as a result. The prosecutor stated that Durgan was not going to be called as a witness. Defense counsel did not object, but pointed out to the trial court that Culpepper did not want a continuance. The trial court stated it would not prevent the witness from testifying.

Also prior to trial, the State filed a motion in limine seeking to preclude the introduction of evidence regarding any incidents between Duck and Durgan that did not result in a conviction, and to preclude the introduction of any evidence of any orders of protection that Duck had involving Durgan. Culpepper's theory of the case was that it was Durgan who shot Duck, and not Culpepper. During the pretrial conference, the State argued that such evidence was inadmissible because there was no direct evidence linking Durgan to the crime. The trial court declined to make an explicit

---

[3] All references to statutes are to RSMo 2000, unless otherwise indicated.

pretrial ruling, but in response to the argument of Culpepper's defense counsel that Culpepper was the "scapegoat," the trial court responded:

> Well, what about the point that nobody says -- there's no witness to establish that anybody but your client did the shooting? . . . [Y]our client can testify and tell his side of the story [that Durgan was the shooter.] Then you can get into all that. . . . Well, I mean, you'll probably have some leeway; I just don't know that you're going to have as much as you want. . . . And [Culpepper's] offer of proof may change my mind.

A jury trial commenced on July 28, 2015. Culpepper did not testify. Duck testified that prior to the shooting, she had gone into the motel bathroom to take a bath. She testified she heard Culpepper and Durgan arguing, and then heard someone get violently slapped. Duck indicated that, at this point, she got dressed and exited the bathroom. She testified that after Culpepper threatened to shoot Durgan, she moved to Durgan's side. Culpepper then discharged the pistol into her arm.

Duck indicated that when Officer Douglas arrived on the scene, she told him that Culpepper had shot her. She testified she was "kind of shocked that he did it because -- I was just shocked."

Before his cross-examination of Duck, Culpepper's attorney made an offer of proof concerning the ex parte order of protection Duck had obtained against Durgan in October 2014 because of violent behavior toward her in the presence of her children. The ex parte order of protection was still in effect at the time of the shooting. Duck testified that Durgan had been violent with her on another occasion in August 2012. Duck denied she was aware of Durgan's previous convictions for domestic assault, assault, and harassment prior to her relationship with him. After the offer of proof, the trial court made no further ruling. Culpepper's attorney then began his cross-examination of Duck.

Before trial on the second day, Culpepper's defense counsel—anticipating the testimony of Officer Douglas—made an objection to Officer Douglas being allowed to recite Duck's

4

statement to him that Culpepper was the one who shot her. Defense counsel argued that it was hearsay and did not fall under any hearsay exceptions; that if the State intended to say that the statement was an "excited utterance," it would not qualify as such because there was sufficient time between the shooting and when Officer Douglas arrived for Duck and Durgan to have fabricated a story; and that it was also cumulative, improper bolstering, and not legally admissible because its probative value outweighed its prejudice. The State rebutted by arguing that the statement was spontaneous and was made at a time of stress and physical pain. The trial court overruled the objection and allowed the testimony.

Officer Douglas testified he arrived at the scene within five minutes of the 911 call. When he arrived, Durgan was in the parking lot "frantically" flagging him down. When the prosecutor asked Officer Douglas what Durgan initially told him in the parking lot, defense counsel made a hearsay objection. The objection was overruled. Officer Douglas testified that Durgan told him his girlfriend had been shot. Upon entering the motel room, Officer Douglas observed Duck on the bed bleeding from a gunshot wound to her right wrist. Officer Douglas testified that Duck told him that Culpepper had shot her.

Deputy Andrew Webb ("Deputy Webb"), with the Greene County Sheriff's Department, was called to testify. Before the State's examination of Deputy Webb could begin, Culpepper's attorney objected to any testimony regarding Culpepper's arrest approximately three weeks after the shooting. Culpepper's attorney argued that Culpepper's flight did not show a consciousness of guilt; Culpepper was unaware there was a probable cause warrant out for his arrest; it was not relevant, material, and was evidence of a prior bad act in which charges were still pending; and its prejudicial value outweighed its probative value. The State argued that Culpepper's arrest was

5

close in time to the shooting, and it was evidence of flight in consciousness of guilt. The trial court overruled the objection.

Deputy Webb then testified that a car Culpepper was riding in was stopped for a traffic violation. Culpepper gave a false name, and when the driver of the vehicle was removed from the car, Culpepper jumped into the driver's seat and drove away. Culpepper was arrested, and a search of the vehicle revealed crack cocaine in the front seat near the driver.

Merryman appeared to testify, but was found to be impaired and was released. The parties agreed that her videotaped deposition, taken on July 22, 2015, could be played for the jury in lieu of her live testimony. Defense counsel stated he believed Merryman's videotaped statement, taken on February 10, 2015, would also be played during the testimony of Detective Brandon Cole ("Detective Cole").

State's Exhibit 32, the video deposition of Merryman, was played for the jury. In that deposition, Merryman stated there were four people in the motel room just before the gunshot, including herself, and specifically identified Culpepper by name as being there as well. However, Merryman stated she did not remember speaking with Detective Cole on the morning of the shooting, denied making various specific statements at that time, and also denied making specific statements during any interviews after the shooting.

Detective Cole testified he interviewed Merryman after she arrived at the Greene County Jail on February 10, 2015. The State entered in evidence Exhibit 33—Merryman's "court-edited interview" with Detective Cole. Defense counsel objected that it was "not a prior sworn statement," was not "entirely inconsistent," and asked that it not be allowed. The trial court overruled the objection and the interview was played for the jury.

6

Due to the poor quality of the audio, after Merryman's videotaped statement was played for the jury, the prosecutor asked Detective Cole, "What was it that she was saying about that [after you told her to tell you what she knew]?" Defense counsel objected stating that the video was the best evidence, and the jury could listen to the video rather than Detective Cole's interpretation. The trial court overruled the objection.

The prosecutor then asked Detective Cole, "What was it you remember her saying at that point?" Defense counsel made no objection to this question. In the interview, Merryman stated that Culpepper had the gun, Duck said something to Culpepper which caused Durgan to stand up for Duck, Culpepper and Durgan were "talking shit," and a threat was made of "I'm going to kill you." Merryman indicated Culpepper had the gun and tried to "raise it up and shot it." At one point in the interview, Detective Cole admitted he began calling Culpepper "Eugene Johnson." However, when asked by Detective Cole, "What about Culpepper?" Merryman responded, "That's the same person." Merryman also identified Culpepper as "Eugene Culpepper."

During cross-examination, defense counsel did not challenge Detective Cole's testimony regarding what Merryman told him during the interview.

Darian Stinson ("Stinson"), an employee in the firearm and tool mark section of the Missouri State Highway Patrol Crime Lab, testified without objection that she analyzed evidence associated with "Springfield Police Report No. 15-5254"[4] in which Culpepper was named as a suspect. She analyzed the handgun, magazine, expended bullet, and expended cartridge case. She

---

[4] The amended information indicates that Darian Stinson would be testifying to "(Firearms, lab case #0437712)." Stinson was asked at trial if she analyzed evidence associated with "Springfield Police Report No. 15-5254" to which she responded "Yes." Culpepper has asserted in his Point XI that Stinson's testimony violated his rights to due process because Stinson was "endorsed for a different case as indicated by the lab report number listed on the amended information." Neither the lab report with case number #0437712, nor the Springfield Police Report No. 15-5254, were deposited with this Court as part of the record on appeal. As a result, this Court is unable to verify whether Culpepper's assertion is correct. Culpepper further indicates in his Point XI that this issue is only being raised for the "purposes of preservation."

could not state conclusively, after comparing a test-fired round to the expended bullet retrieved at the scene, that the expended bullet could have been fired from the handgun retrieved from the scene. However, both expended bullets shared some characteristics so she could not eliminate it either. She did confirm through testing that the expended cartridge case had been fired from the gun. Her findings were verified through a peer review of her report and conclusions.

After the State rested, Culpepper filed his "Motion for Judgment of Acquittal at the Close of State's Evidence," arguing the State had not made a submissible case that Culpepper attempted to assault Durgan. The trial court overruled the motion.

Culpepper called Marcie Abbey ("Abbey"), an employee in the DNA section of the Missouri State Highway Patrol Crime Lab. Abbey testified she performed a DNA analysis on the handgun used in the shooting. She did find DNA on the gun, but after comparing it to the sample provided by Culpepper, her findings were inconclusive as to whether Culpepper could be included or excluded as a contributor.

In the State's cross-examination, Abbey stated she was unable to get a sufficient sample of DNA from the gun to compare with the sample provided by Culpepper. Abbey explained that a DNA profile appears as a graph of peaks and each peak is represented by a number that represents an "allele," which is equivalent to a gene. The State asked Abbey, "How many alleles of [Culpepper] were consistent with that small amount of DNA from the handgun?" Culpepper's counsel objected on the basis that the question had been asked and answered. The trial court overruled the objection. The State then asked Abbey how many alleles were consistent. Abbey responded that the DNA profile from the handgun was a mixture of more than one individual, but all of Culpepper's alleles were represented in that mixture except for one allele at one location. There was no allele present to compare that one allele to because the profile from the handgun was

8

of poor quality. She confirmed that Culpepper could not be excluded based on the DNA sample and that his alleles were represented at every location except the one.

Culpepper then rested and filed his "Motion for Judgment of Acquittal at the Close of all Evidence." Culpepper's counsel reiterated his same argument that the State had not made a submissible case that Culpepper attempted to assault Durgan. The trial court overruled the motion.

The jury found Culpepper guilty on all three counts. Culpepper filed a "Motion for Judgment of Acquittal Notwithstanding the Verdict of the Jury or in the Alternative for a New Trial" on August 21, 2015. The trial court overruled the motion on November 23, 2015, and the court proceeded with sentencing. Culpepper claimed that there were factual errors in the "prior supervision history" section of the sentencing assessment report, but did not substantiate these claims.

Culpepper was sentenced on Count I—assault in the first degree—as a prior and persistent offender, to 20 years in the DOC, to run consecutive to Count III but concurrent with Count II; on Count II—armed criminal action—to 5 years in the DOC to run concurrent to Count I; and on Count III—second-degree assault— as a prior and persistent offender, to 10 years in the DOC, to run consecutive to Count I, for a total of 45 years. This appeal followed.

In twelve points on appeal, Culpepper asserts the trial court erred in: (1) "sustaining the State's objection to defense counsel's offer of proof regarding prior acts of violence" Durgan perpetrated on Duck, for which she took out an order of protection against Durgan; (2) overruling defense counsel's objection to the testimony of Officer Douglas that Duck identified Culpepper as the shooter; (3) overruling defense counsel's objection to the testimony of Officer Douglas that Durgan identified Culpepper as the shooter; (4) overruling defense counsel's objections to evidence of Culpepper's arrest and flight from officers three weeks after the shooting;

(5) overruling defense counsel's objection to Abbey's testimony that several DNA alleles found on the gun were the same as Culpepper's; (6) overruling defense counsel's objection to Exhibit 33—Merryman's videotaped statement to police because in it she identified Culpepper as "Eugene Johnson"; (7) overruling defense counsel's objection to the admission and publication of Exhibit 33 by Detective Cole as a "prior inconsistent statement" because the tape was not admissible as substantive evidence pursuant to section 491.074[5] and was therefore hearsay; (8) overruling defense counsel's objection and permitting Detective Cole to testify about the contents of Merryman's videotaped interview because the testimony violated the best evidence rule and invaded the province of the jury; (9) overruling defense counsel's motions for judgment of acquittal because there was insufficient evidence from which a rational finder of fact could find Culpepper guilty beyond a reasonable doubt; (10) in permitting the trial to proceed in the absence of Durgan because it violated Culpepper's right to confront and cross-examine Durgan; (11) allowing the endorsement of State's witness Stinson because this violated Culpepper's right to be tried only for the crime charged; and (12) considering the sentencing assessment report as it contained inaccuracies. For ease of analysis, we address these points out of order.

**Analysis**

*Admission or Exclusion of Evidence: Points I, II, IV, and V*

"A trial court has broad discretion to admit or exclude evidence," and its decision will be reversed only for a clear abuse of discretion. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006) (internal quotation and citation omitted). A court abuses its discretion when its ruling "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful

---

[5] Section 491.074 states: "Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

consideration." *Id.* (internal quotation and citation omitted). "Moreover, in cases concerning the admission or exclusion of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Cofield*, 95 S.W.3d 202, 205 (Mo.App. S.D. 2003) (internal quotation and citation omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Pickens*, 332 S.W.3d 303, 318 (Mo.App. E.D. 2011).

In his first point, Culpepper argues that the trial court abused its discretion in excluding evidence of Durgan's alleged past violent acts against Duck.

Culpepper's theory at trial was that Durgan shot Duck. The State filed a motion in limine seeking to prevent the introduction of evidence regarding any incidents between Duck and Durgan that did not result in a conviction, and evidence of any orders of protection against Durgan by Duck. During the pretrial hearing, the prosecutor argued that such evidence was inadmissible because there was no direct evidence linking Durgan to the crime. The trial court made the following ruling at the hearing:

> Well, what about the point that nobody says -- there's no witness to establish that anybody but your client did the shooting? . . . [Y]our client can testify and tell his side of the story [that Durgan was the shooter.] Then you can get into all that. . . . Well, I mean, you'll probably have some leeway; I just don't know that you're going to have as much as you want. . . . And [Culpepper's] offer of proof may change my mind.

After the prosecutor's direct examination of Duck, Culpepper made an offer of proof. Duck testified that she was granted an order of protection against Durgan in October 2014 because of his violent behavior. Duck testified that Durgan had been violent with her on another occasion in August 2012.

The "direct connection rule" governs the admissibility of evidence relating to a third person's guilt:

11

> To be admissible, evidence that another person had an opportunity or motive for committing the crime for which a defendant is being tried must tend to prove that the other person committed some act directly connecting him with the crime. The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

*Nash*, 339 S.W.3d at 513.

"When the evidence is . . . disconnected or remote and there is no evidence that the other person committed an act directly connected to the offense, the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury." *State v. Bowman*, 337 S.W.3d 679, 686 (Mo. banc 2011). "Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991).

The proffered evidence was disconnected and remote—the order of protection took effect in October 2014, and the crimes of which Culpepper was convicted occurred on February 10, 2015. None of the alleged violent acts contained in the order of protection or to which Duck would have testified occurred on the night of the crime. The evidence does not connect Durgan to an act connected to the crime. The trial court did not abuse its discretion in excluding evidence of Durgan's alleged past violent acts against Duck. Point I is denied.

In Culpepper's second point, he argues the trial court abused its discretion in admitting Officer Douglas' statement that Duck identified Culpepper as the shooter.

12

Anticipating that Officer Douglas would testify as to Duck's identification of Culpepper as the shooter, Culpepper objected on the basis of hearsay, and in support of his objection, read for the trial court a portion of Officer Douglas' report:

> At 2/10/15 at 0610 hours, I was dispatched to Battlefield Inn, 2114 South Glenstone, in reference to a female who had just been shot. I activated my overhead lights and siren and responded to that location. Upon my arrival, a male was standing in the parking lot waving his arms above his head, attempting to get my attention. He advised his girlfriend *had just been shot* and then ran to Room 246. I responded to that location, where the male was standing inside the primary room next to a female who was lying on the bed *and screaming that she had been shot*. I immediately noticed a pool of blood on the bed next to the female who also had blood on her person and clothing. . . . While I was providing medical aid to the female, I asked her who shot her. She said the suspect's name was Culpepper and he was a black male but could not provide – but she could provide no further description or a reason for her being shot. *She repeatedly told me she was in incredible pain and was unable to focus on the majority of the questions I asked*.[6]

(Quotation marks omitted) (Emphases added).

The prosecutor argued that the testimony fell under the excited utterance exception to the hearsay rule. The trial court overruled the objection, and agreed to treat it as a continuing objection.

After the objection was overruled, the prosecutor began questioning Officer Douglas. Officer Douglas testified that he arrived in less than five minutes after the 911 call. When he arrived, a man in the parking lot flagged him down. The man was "frantic" and "desperately wanted" to get Officer Douglas' attention. When Officer Douglas followed the man into the motel room, he saw Duck lying on the bed, screaming that she had been shot. There was a lot of blood on Duck and the bed she was lying on, and Officer Douglas could tell that the blood was coming

---

[6] Officer Douglas' report was not filed with this Court as part of the record on appeal. Thus, we recite that portion of the transcript wherein Culpepper's attorney read this part of Officer Douglas' report to the trial court.

from Duck's wrist and forearm area. Duck told Officer Douglas that a black male named Culpepper shot her. All of this occurred before medical personnel arrived.

At trial, Duck testified that in the motel room, Culpepper was "frantically" searching for his gun, which was in his coat pocket. She stated she then saw Culpepper raise his arm and she was shot. The prosecutor asked, "Do you remember telling Officer Douglas that Culpepper shot you?" Duck responded, "Yes. I was kind of shocked that he did it because -- I was just shocked." Duck also identified Culpepper in court as the shooter.

> The excited utterance exception to the general rule against hearsay applies when: (1) a startling event or condition occurs; (2) the statement is made while the declarant is still under the stress of the excitement caused by the event and has not had the opportunity to fabricate the story; and (3) the statement relates to the startling event.

*State v. Riley*, 440 S.W.3d 561, 566 (Mo.App. E.D. 2014).

On the record, as we must review it, Duck's statement to Officer Douglas was made after a startling event occurred and her statement related to the startling event. The trial court could reasonably have found that Duck was still under the stress of the excitement caused by the event when the statement was made. The statement was made within minutes after the shooting. When Duck made the statement to Officer Douglas, she was screaming, stating that she had been shot; the wound was still bleeding; there was a lot of blood on Duck and the bed on which she was lying; she was in severe pain; and medical personnel had yet to arrive. The trial court properly could have found that the excited utterance exception to the hearsay rule applied.

Further, the declarant of the challenged statement, Duck, testified at trial and was available for cross-examination. "[P]rejudice will not be found from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to cross-examination because the primary defects in hearsay testimony are alleviated." *State v.*

14

*Jackson*, 426 S.W.3d 717, 719 (Mo.App. E.D. 2014). The trial court did not abuse its discretion in allowing the identification testimony of Duck. Point II is denied.

In Point IV, Culpepper argues that the trial court abused its discretion in admitting evidence of Culpepper's flight from officers three weeks after the shooting.

Duck was shot on February 10, 2015. On March 3, 2015, Officer Webb pulled over a vehicle for an inoperable side taillight. Culpepper, a passenger in the backseat of the vehicle, gave a fake name to Officer Webb. When the driver got out of the vehicle, Culpepper jumped into the driver's seat and drove away. After a brief chase, Culpepper was located in a nearby apartment.

On cross-examination, defense counsel asked whether anything illegal was found in the car. Officer Webb testified that crack cocaine was found. On redirect examination, Officer Webb testified that the drugs were found next to the driver of the vehicle, "on the passenger side in the front of the vehicle up around where [the driver] was located."

Culpepper objected to the testimony, arguing that it was not evidence of flight because of the remoteness in time and because Culpepper allegedly was unaware of any warrant, and additionally arguing that the evidence constituted inadmissible prior-bad-act evidence. The trial court overruled the objection.

"Evidence of flight is admissible to show consciousness of guilt." *Hosier*, 454 S.W.3d at 895. "Moreover, the methodology of flight is probative as to the quality and depth of this consciousness." *Id.* "Flight need not be traced from the exact scene of an offense." *State v. Lockett*, 639 S.W.2d 132, 135 (Mo.App. W.D. 1982). "Flight may occur from the scene of the crime or elsewhere if it is in order to avoid arrest or prosecution." *State v. Cotton*, 621 S.W.2d 296, 300 (Mo.App. E.D. 1981). "Remoteness of flight in space and time from the scene and time of the alleged crime goes only to the weight of the evidence and not to its admissibility." *Id.*

15

The evidence of flight was admissible to demonstrate Culpepper's consciousness of guilt. The fact that flight occurred at a different location, three weeks after the shooting, does not make the evidence of flight inadmissible. Such remoteness goes to weight, not admissibility.

Further, Culpepper elicited testimony regarding the crack cocaine. Thus, Culpepper cannot argue that evidence of crack cocaine being in the car was inadmissible evidence of a prior bad act. "[A] defendant cannot complain about matters that he himself brings into the case." *State v. Colbert*, 949 S.W.2d 932, 941 (Mo.App. W.D. 1997) (internal quotation and citation omitted).

The trial court did not abuse its discretion in admitting evidence of Culpepper's flight. Point IV is denied.

In his Point V, Culpepper argues that the trial court abused its discretion in admitting Abbey's testimony that several DNA alleles found on the gun were the same as Culpepper's.

"A party who opens a subject is held either to be estopped from objecting to its further development or to have waived the right to object to further development." *Booker v. State*, 457 S.W.3d 349, 352-53 (Mo.App. W.D. 2015). Culpepper elicited testimony from Abbey indicating that Culpepper could be neither included nor excluded as a contributor to any DNA found on the gun. Once Culpepper opened the door to this inquiry, the prosecutor was free to, and did, develop the subject during cross examination. Such evidence was admissible. The trial court did not abuse its discretion in overruling Culpepper's objection to Abbey's testimony that several DNA alleles found on the gun were the same as Culpepper's. Point V is denied.

*Unpreserved Claims of Error:  Points III, VI, VII, VIII, X, and XI*

In order to preserve an evidentiary issue for appeal in a jury-tried case, an objection must be made upon introduction of the evidence and that objection must be reasserted as error in a motion for new trial.  An allegation of error in a motion for new trial may not be changed or broadened on appeal and must be based upon an objection made at the time of trial. Allegations of error must be sufficiently definite to direct the trial court's attention to the particular acts or rulings asserted to be erroneous so that the trial court has an opportunity to correct them.

*State v. Howery*, 427 S.W.3d 236, 248 (Mo.App. E.D. 2014) (internal citations omitted).

Where such issues are not properly preserved, this Court may exercise its discretion to review for plain error pursuant to Rule 30.20.[7]

Rule 30.20 provides that 'plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted.'  Plain-error review involves a two-prong determination.  First, we determine whether the trial court committed plain error.  Plain error is error that is evident, obvious, and clear.  If we find plain error, we then consider the second prong:  whether a manifest injustice or miscarriage of justice has actually occurred as a result of the error.

*State v. Ragland*, 494 S.W.3d 613, 627 (Mo.App. E.D. 2016) (internal quotations and citations omitted).  We address and apply these principles as applicable to each of Culpepper's unpreserved claims.

In Point III, Culpepper argues that the trial court plainly erred in overruling defense counsel's objection to Officer Douglas' testimony that Durgan identified Culpepper as the shooter.  Culpepper failed to include this argument in his motion for new trial, and Culpepper concedes this argument is therefore not preserved for our review.  *See State v. Elam*, 493 S.W.3d 38, 42 (Mo.App. S.D. 2016).  We decline to engage in plain error review.  Point III is denied.

In Culpepper's Point VI, he asserts the trial court abused its discretion in overruling his objection to Exhibit 33—Merryman's videotaped statement to police.  Specifically, Culpepper

---

[7] All rule references are to Missouri Court Rules (2016).

argues that this evidence was unfairly prejudicial because Merryman told police that "Eugene Johnson" was the man involved in the shooting, and not Culpepper.

Prior to the video being played, Culpepper objected on the grounds that the video was not a prior sworn statement and that it was not entirely inconsistent. The objection was overruled. In his motion for new trial, Culpepper argued that it was error to admit the video on the grounds that the video was not relevant because Merryman referred to "Eugene Johnson" and not to Culpepper. On appeal, Culpepper now argues that the video was inadmissible because its probative value was outweighed by its prejudicial impact because Merryman "told the police that Eugene Johnson was the man involved in the shooting, not Eugene Culpepper."

To preserve an issue for appeal, "an objection stating the grounds must be made at trial, the same objection must be set out in the motion for new trial and must be carried forward in the appeal brief to preserve it." *State v. Jackson*, 948 S.W.2d 138, 141 (Mo.App. E.D. 1997). Because Culpepper's objection on appeal is different than the objection made at trial, and because the issue raised in his motion for new trial was different than his objection at trial, Culpepper's point has not been preserved for review. Culpepper does not request plain error review, and we do not grant it. Point VI is denied.

In Culpepper's Point VII, he argues that the trial court plainly erred in overruling his objection to the admission and publication of Exhibit 33——the videotaped interview of Merryman by Detective Cole—as a "prior inconsistent statement" because the tape was not admissible as substantive evidence pursuant to section 491.074 and was therefore hearsay.

The shooting occurred at approximately 6:00 a.m. on February 10, 2015. Detective Cole interviewed Merryman approximately 3.5 hours later, at 9:30 a.m. Detective Cole testified that

during that interview, Merryman stated that Culpepper and Durgan got into an argument and then Culpepper "tried to raise [the gun] up and shot it."

Merryman's deposition was taken on July 22, 2015. The State intended to call Merryman as a witness at trial; however, on the day of trial, Merryman appeared to be impaired. The parties stipulated to playing the deposition video for the jury instead of having Merryman testify at trial. During the deposition, Merryman stated she did not remember speaking with Detective Cole on the morning of the shooting; denied making various, specific statements; denied remembering making various specific statements to Detective Cole or other officers during any interviews after the shooting; and again stated she did not remember making any statements to police after the shooting.

As Culpepper concedes, section 491.074 explicitly provides that prior inconsistent statements are admissible at trial to prove the truth of the matter asserted. Merryman stated during her deposition testimony that she did not make some of the specific statements contained in the interview video with Detective Cole, and stated she did not remember making the other specific statements contained in the interview video with Detective Cole. Thus, the interview video was admissible as a prior inconsistent statement under section 491.074. The trial court did not err, plainly or otherwise. Point VII is denied.

In his eighth point, Culpepper argues that the trial court plainly erred in overruling defense counsel's objection to Detective Cole's testimony regarding the contents of Merryman's videotaped interview because the testimony violated the best evidence rule.

Detective Cole interviewed Merryman approximately 3.5 hours after the shooting. The videotaped recording was played for the jury. Because of the audio quality of the recording, some of the dialogue was difficult to hear. After the video was played for the jury, the prosecutor asked

Detective Cole, "What was it that she was saying about that [after you told her to tell you what she knew]?" Culpepper objected, stating that the video was the best evidence, and the jury could listen to the video rather than Detective Cole's interpretation. The trial court overruled the objection.

The prosecutor then asked Detective Cole, "What was it you remember her saying at that point?" Detective Cole explained what Merryman had told him during the interview. Culpepper did not object to this explanation. During Culpepper's cross-examination of Detective Cole, Culpepper did not challenge Detective Cole's testimony regarding what Merryman told him during the interview.

"The best evidence rule applies only when the terms of the writing [or other document] itself are in dispute, not simply when a witness with personal knowledge testifies concerning facts that also happen to be contained in a writing [or other document]." *State v. Galazin*, 58 S.W.3d 500, 504 n.1 (Mo. banc 2001). "In other words, the best evidence rule does not exclude evidence based on personal knowledge even if documents would have provided the same information." *Id.* The contents of the video were not in dispute, and Detective Cole had personal knowledge of what Merryman told him during the interview. The trial court did not plainly err in overruling defense counsel's objection to this testimony. Point VIII is denied.

In his tenth point relied on, Culpepper claims the trial court erred in failing to *sua sponte* forestall the trial in the absence of witness Durgan, or declare a mistrial when neither defense counsel nor the prosecution called Durgan as a witness.

Pretrial, defense counsel told the court that he had an ethical dilemma if the State called Durgan as a witness. He indicated that he had not prepared for Durgan to be a witness, that Culpepper had refused to ask for a continuance, and that he thought he might not be able to effectively represent Culpepper's interests as a result. The prosecutor stated that Durgan was not

20

going to be called as a witness. Defense counsel did not object, but pointed out to the trial court that Culpepper did not want a continuance. The trial court stated it would not prevent the witness from testifying.[8]

Culpepper did not include this argument in his motion for new trial. Thus, the issue has not been preserved for appeal. *State v. Winfield*, 5 S.W.3d 505, 511 (Mo. banc 1999). Point X is denied.

In his eleventh point, Culpepper argues that the trial court plainly erred in allowing the State to endorse witness Stinson, in that Stinson was endorsed for a different case per the lab report number listed on the amended information. Culpepper fails to allege or demonstrate prejudice on the basis of this claim. As a result, plain error review is unavailing. *State v. Coram*, 231 S.W.3d 865, 870 (Mo.App. S.D. 2007). Point XI is denied.

### *Insufficient Evidence to Support Conviction: Point IX*

In Point IX, Culpepper argues that the trial court erred in failing to grant his motions for judgment of acquittal because there was insufficient evidence to support his convictions of assault in the first degree, armed criminal action, and assault in the second degree.

> Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt. This Court considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences. Contrary evidence and inferences are disregarded. The Court will not supply missing evidence or grant the State unreasonable, speculative, or forced inferences.

*State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016) (internal citations omitted).

In his point relied on, Culpepper claims the evidence was insufficient to support a conviction because the evidence showed only that Culpepper was present at the scene, not that he

---

[8] Ex gratia, we note that "[a] defendant has no right to confront a witness who gives no evidence at trial." *State v. Croka*, 693 S.W.2d 133, 137 (Mo.App. W.D. 1985).

was the shooter. In the "Analysis" portion of his brief, Culpepper does not explain how the evidence was insufficient to support his convictions. Culpepper makes no argument illustrating how the evidence failed to show that he was the shooter. Rather, Culpepper makes the bare assertions that "the state had the burden to prove both the substantive elements of the crime and [Culpepper]'s criminal involvement" and that "[t]he evidence was insufficient for a reasonable finder of fact to find him guilty beyond a reasonable doubt." Because Culpepper has failed in the argument portion of his brief to support the issue raised in his point relied on, Culpepper has abandoned the argument. *State v. Nunley*, 341 S.W.3d 611, 623 (Mo. banc 2011). Point IX is denied.

### *Error in Sentencing: Point XII*

In Point XII, Culpepper alleges that the trial court plainly erred in considering Culpepper's sentencing assessment report at Culpepper's sentencing hearing because the report contained inaccuracies.

Culpepper was charged as, and found to be, a persistent offender. As a result, the trial court, not the jury, sentenced Culpepper. Culpepper received concurrent sentences of 20 years for the first-degree assault charge and 5 years for the armed-criminal-action charge. Culpepper also received a 10-year sentence for the second-degree assault charge, which was ordered to run consecutively to the other sentences.

The trial court reviewed the sentencing assessment report for assistance in determining Culpepper's sentence. Culpepper argued at sentencing that the sentencing assessment report contained inaccurate information, but provided the court no evidence to support this allegation.

22

Because of Culpepper's failure to point to evidence in the record substantiating his claim that there were inaccuracies in the sentencing report, his claim is unavailing.[9] "A bare assertion by Defendant does not prove itself and is not evidence of the facts presented." *State v. Snowden*, 285 S.W.3d 810, 815 (Mo.App. S.D. 2009) (internal quotation and citation omitted). We will not speculate as to matters not properly before us in the record. As a result, we do not engage in plain error review. Point XII is denied.

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – CONCURS IN SEPARATE OPINION

DANIEL E. SCOTT, J. – CONCURS

---

[9] While we note Culpepper's submission of his sentencing assessment report in the supplemental legal file, there is nothing in the record to substantiate his claims of errant information in the report.


| STATE OF MISSOURI, | ) | |
| --- | --- | --- |
| | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | No. SD34231 |
| | ) | Filed: November 9, 2016 |
| EUGENE CULPEPPER, JR., | ) | |
| | ) | |
| Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin R. Holden, Circuit Judge

**CONCURS IN RESULT**

I concur with the result, however, I write separately to express my disagreement with the majority opinion's analysis regarding the exclusion of evidence of Durgan's (Victim's long-term boyfriend) past violent acts against Duck ("Victim"). The majority analysis finds that the proffered evidence was disconnected and remote and, thus, not admissible. I disagree. Only four people were present at the time that Victim was shot; one of them was Victim's boyfriend. Victim's testimony included the fact that she had been using drugs on the night in question and was confused as to what actually happened. She initially did not want to cooperate with the police. Likewise, a second person at the

scene was under the influence of heroin when she gave inconsistent statements as to what had transpired; and admitted she could not really remember what happened after she got sober. She admitted her reality was impaired at the time of the shooting.

Defendant's theory of the case from the beginning was that Victim and Durgan made Defendant the scapegoat of the shooting. To support that contention, Defendant made an offer of proof concerning the violent nature of Victim and Durgan's relationship. Specifically, Defendant wanted to be able to cross-examine Victim for "her bias, her prejudice, and her interests" in her testimony by introducing her sworn statements that Durgan had been violent with her as recently as four months prior to the shooting. In her sworn petition to get an order of protection, Victim stated that Durgan had "[b]roke in by just walking in and was physical with me, fighting and cussing, and went into the kitchen, grabbed a box cutter, and cut his wrists." She further stated in the petition that she was afraid of Durgan, that there was "an immediate and present danger of domestic violence" because he was "violent, harmed me physically, paranoid schizophrenic, depressive, paranoid delusional, so he sees and hears things that aren't there," and "[h]e's abusive, paranoid schizophrenic, paranoid delusional, manic-depressive, long extensive violent rap sheet. I am in fear for our lives and want him to stay away from me at all times." She admitted that the violence was escalating and that Durgan had previously tried to strangle her and hit her on her head. Victim further admitted that the order of protection was still in effect on the night that she got shot. The court denied the admission of the petition for the order of protection and the fact that an order of protection was granted.

"Generally, a defendant may introduce evidence tending to show that another person committed the charged offense, unless the probative value of the evidence is

2

substantially outweighed by its costs, such as undue delay, prejudice or confusion." ***State v. Benedict***, 495 S.W.3d 185, 191 (Mo.App. E.D. 2016). An exception to that general rule then is the "direct connection" rule, which basically says you cannot "merely" show that another person had motive or opportunity, or the evidence is otherwise disconnected or remote AND there is no evidence that the other person committed an act directly connected to the offense because it has a tendency to confuse or misdirect the jury. ***Id.*** In other words, you cannot "cast bare suspicion on another person." ***Id.*** I do not believe the "direct connection" rule applies in this case. The *corpus delicti* of a crime is "the substantial and fundamental fact or facts (as, in murder, actual death and its occurrence as a result of criminal agency) necessary to prove the commission of a crime[.]" *Webster's Third New International Dictionary Unabridged* 511 (1986). Here, we have contradictory testimony from Victim and a third person present at the crime scene. We also have Durgan, another person, admittedly present at the crime scene. The evidence proffered certainly was relevant as to Victim's bias, prejudice, and interests. The majority opinion hangs its hat on the language regarding "disconnected and remote." The fact that a violent boyfriend was present on the day of the shooting is certainly not disconnected or remote. The jury should have been able to weigh the conflicting evidence and could have accepted all, none, or part of Victim's testimony.[1]

Nonetheless, the court could have excluded the evidence on the basis that the probative value was substantially outweighed by its prejudice or confusion. Additionally, we review the exclusion of the evidence for prejudice. Although hindered by not being able to present his full cross examination of Victim, Defendant was able to question Victim

---

[1] None of the cases cited by the majority opinion have a factual situation where the "other" person was at the crime scene and had a history of violence with this particular victim.

3

about her relationship with Durgan.  She admitted that their relationship had been off and on for years, that it was contentious and that he was violent with her.  Defense counsel argued in closing argument that Durgan's "presence haunts this case like a specter" and suggested that Victim and Durgan were using Defendant as a scapegoat.  Because Defendant was able to adequately present his defense without the proffered evidence, I would find no prejudice and also deny the point.


Nancy Steffen Rahmeyer, J. – Concurring Opinion Author